**SAMJENS PARTNERS I and Samjens Acquisition Corp., Plaintiffs,**

v.

**BURLINGTON INDUSTRIES, INC., BI/MS Holdings, Inc., BII Acquisition Corp., Frank S. Greenberg, Donald R. Hughes, Lanty L. Smith, Joseph F. Abely, Jr., Joseph W. Barr, Michael J. Dargan, John P. Harbin, John J. Horan, Frank S. Jones, William A. Klopman, John K. McKinley, Paul J. Rizzo and Louis Von Planta, Defendants.**

No. 87 Civ. 3721 (SWK).

United States District Court, S.D. New York.

June 22, 1987.

Paul, Weiss, Rifkind, Wharton & Garrison by George P. Felleman, Jay Greenfield, New York City, for plaintiffs.

Davis Polk & Wardwell by Arthur F. Golden, John G. Rich, David G. Golden, David D. Brown, IV, Julie R. O'Sullivan, New York City, for defendants, Burlington Industries and individual defendants.

Shearman & Sterling by Kenneth M. Kramer, Dennis P. Orr, David J. Mark, Kenneth A. Freeling, Barbara J. Gould, New York City, for defendants, BI/MS Holdings, Inc. and BII Acquisition Corp.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiff Samjens Partners I ("Samjens") is a partnership which as of May 5, 1987 owned approximately 13 percent of Burlington's outstanding common stock. Plaintiff Samjens Acquisitions Corporation is a wholly owned subsidiary of Samjens. On May 6, 1987, Samjens commenced a tender offer for all shares of Burlington Industries, Inc. common stock at $67 per share. Subsequently, Samjens has raised its offer twice: to $72 and then $77 per share.

Defendant Burlington is a textile manufacturer incorporated in Delaware. Defendants BI/MS Holdings, Inc. and BII Acquisition Corp. are subsidiaries of Morgan Stanley Group, Inc. ("Morgan"). While the Samjens offer was pending, Morgan entered into a merger agreement (the "merger agreement") with Burlington pursuant to which it has commenced a $76 per share and later a $78 per share tender offer for all outstanding shares of Burlington common stock. Defendants Frank S. Greenberg, Donald R. Hughes, and Lanty L. Smith are directors and officers of Burlington. The remaining defendants (the "directors" or the "Board") are independent directors of Burlington.

Plaintiffs bring nine claims for relief. In Counts I through IV, plaintiffs assert that various defendants violated Sections 13(e), 14(d), and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(e), 78n(d), and 78n(e). Plaintiffs allege that defendants made various material omissions and misrepresentations in: 1) the Burlington Schedule 14D–9 filed in response to Samjens' first tender offer; 2) a May 13, 1987 letter from Greenberg to Burlington stockholders with respect to Samjens' offer; 3) Burlington's May 14, 1987 tender offer for up to eight million shares of its common stock (the "self-tender offer") at $80 per share; and 4) Morgan's offer to purchase Burlington's common shares and Burlington's Schedule 14D–9 recommending acceptance of the offer. Counts V through IX allege various state law violations including: 1) breach of fiduciary duty by approving the merger agreement, refusing to negotiate with plaintiffs, and disseminating false and misleading information to stockholders; 2) using corporate assets to pay the fees and expenses of Morgan, agree to pay a $25 million fee (the "break-up fee") to Morgan should its offer fail, and refusing to pay the fees and expenses of other bona fide offerors; and 3) interfering with plaintiffs' business advantage.

This case is presently before the Court upon plaintiffs' motion, pursuant to Rule 65 of the Federal Rules of Civil Procedure, for a preliminary injunction prohibiting the defendants from: 1) implementing the merger agreement or accepting shares tendered pursuant to Morgan's tender offer until defendants have either terminated the break-up fee and expense reimbursement provision of the merger agreement or granted other competitive bidders the same terms as offered to Morgan; 2) pursuing Burlington's May 14, 1987 self-tender offer; 3) accepting for payment or paying for any shares tendered into the self-tender offer; and 4) pursuing the merger agreement or the Morgan tender offer until they have filed corrective disclosures.

The Court did not hold an evidentiary hearing on plaintiffs' motion. Rather, the parties made voluminous submissions, in-

cluding documents, affidavits, and deposition transcripts. The Court's examination of these submissions indicates that there are only two unsettled facts—whether Samjens told Burlington on May 18 that it would not make a higher bid and whether there is any agreement between Morgan and Burlington management under which management will receive an equity share of Burlington. The latter issue can be resolved on the papers, and the former is not necessary to a disposition of this case.

### FACTS

The following constitutes the Court's findings of fact. Beginning in February 1987, various affiliates of the plaintiffs commenced purchasing Burlington shares in the open market. On April 7, 1987, defendant Frank Greenberg, Burlington's president, heard a report on television that a group led by Asher Edelman and Dominion Textile, principals of Samjens, had acquired a stake in Burlington. The same report was published the next day in the newspaper *U.S.A. Today.* On April 14, 1987, Samjens filed its Schedule 13D, indicating that it had obtained a 7.6 percent stake in Burlington.

Immediately upon hearing that Edelman had acquired a stake in Burlington, Greenberg began to interview investment banking firms to serve as advisors. The search lasted for approximately one week, and culminated in the retention of First Boston Corporation ("FB") and Kidder, Peabody ("KP") to advise Burlington "with respect to a takeover defense...." (Plaint. exh. 37). Burlington agreed to pay a $1.5 million financial advisory fee and a bonus of from $2 to $4 million if, as of April 15, 1988, nobody had obtained a 30 percent stake in Burlington and a majority of the current board of directors were still in place. Furthermore, Burlington agreed to pay KP and FB a fee in the event certain transactions, such as a merger or acquisition that had the approval of Burlington's Board of Directors ("the Board"), occurred. The next day, at a meeting of the Board, Burlington management (the "manage-ment") informed the Board of the takeover rumors. It also informed the Board that it had retained KP, FB, and independent legal counsel to serve as advisors. The Board approved this after a discussion of their expenses.

In response to the takeover rumor, various groups approached Burlington to inquire about a possible deal. On April 21, 1987, Robert Greenhill of Morgan sent a letter to Greenberg requesting a meeting to discuss the possibility of a deal between Morgan and Burlington. The letter stated, "We would have no interest except in proceeding on a basis agreed upon by your management." (Plaint. exh. 33)

Three days later, Edelman sent the first of a series of letters to Greenberg. It stated that Samjens had acquired a 7.6 percent share of Burlington and offered to purchase Burlington in a negotiated transaction at $60 per share. Edelman threatened a hostile tender offer if Burlington refused a negotiated transaction.

On April 29, 1987, representatives of Burlington's management met with Morgan for the first time. Representing Morgan were Donald Brenner, Alan Goldberg, and Robert Greenhill. In preparation for the meeting, Goldberg obtained a "canned" document from Morgan's files that Morgan used when negotiating merger agreements and edited it for use at the meeting with Burlington. The document listed the general issues that arise in mergers and did not represent a draft agreement or offer. The document, titled "Agenda", contained a number of "talking points". Included among them were:

— MS interested in purchasing Vermont[1] with management.

— MS would pursue the transaction *only* if senior management supported the deal.

— Management would be given 10% of the company equity at closing and allocated an additional 10% upon achieving an agreed to set of performance measures.

1. Vermont was Morgan's code name for Burlington.

— From an operating point of view after the deal this company will be run 100% by the current management team.

— In addition since equity is non-liquidated investment for a time period we would expect senior management's compensation to be significantly adjusted upward. In Container Corp. there was an adjustment factor of 50% and in Mary Kay it was 125%.

— In addition MS is committed to lucrative incentive plans for senior management.

The other points included a description of the proposed financing and a proposed price of $65 per share.

Various topics were discussed at the meeting. Morgan told Burlington that it would decide the future of Burlington's senior management after a merger closed (Brennan dep., p. 45). The evidence indicates that this is, in fact, Morgan's policy in all of its mergers. Morgan also told Burlington that it had closed only one merger in which the company's management did not participate in the ownership (Brennan dep., p. 52). Finally, Morgan told Burlington that it expected that management would participate in the ownership of the new company (Goldberg dep., p. 43). The bulk of the meeting, however, was spent discussing Morgan's proposed financing (Goldberg dep., p. 71). The meeting ended inconclusively, and the parties held a number of subsequent meetings.

On May 6, 1987, Samjens commenced a tender offer for all outstanding shares of Burlington common stock at $67 per share. The offer was to expire on June 3, 1987. On the same date, Edelman sent a letter to the Board informing it of the tender offer and requesting a meeting to discuss the offer and management's participation in the transaction.

Burlington's response to the tender offer was vigorous. On May 11, 1987 the Board met. The investment bankers made a two hour presentation regarding Burlington's value. The Board reviewed slides which depicted the fiscal health of each of Burlington's divisions. The Board determined that SAC's tender offer was inadequate, and rejected it. The Board did not discuss any other parties that had shown interest in Burlington, including Morgan. The Board also discussed ways to enhance the value of Burlington and instructed the investment bankers to solicit bids for Burlington. Burlington filed its Schedule 14D–9 recommending that Samjens' offer be rejected on May 11, 1987.[2] Also on May 11, Greenberg sent a letter to Burlington shareholders stating that the tender offer was not adequate.[3] Burlington also announced that it was considering a number of means to maximize shareholder value, and planned to commence a partial self-tender offer for 25 percent of Burlington common stock at $80 per share.

On the next day, May 12, 1987, Edelman sent a letter to the Board condemning the prospective self-tender offer and the rejection of the Samjens offer. Edelman requested a meeting and asked that Samjens be provided with any information that might justify a higher price for Burlington as well as any other information that the Directors or others interested in Burlington had received. In a letter to Samjens dated May 14, 1987, Greenberg offered Samjens the same information it had provided to other interested parties if it agreed to sign the same confidentiality agreement that the others had signed. Greenberg included the agreement in the letter, but Samjens did not sign it. Greenberg also informed Samjens that Burlington sought to explore a possible sale of Burlington in an orderly fashion, and in light of that, asked Samjens

---

**2.** Although Count I of plaintiffs' complaint challenges the Schedule 14D–9, they do not assert this claim in this motion.

**3.** Plaintiffs' second claim, although challenging Greenberg's May 13 letter, is apparently a challenge to the letters of May 11. They do not, however, raise this claim in the pending motion.

to terminate its tender offer. Samjens has not done so.[4]

Also on May 14, Burlington commenced its self-tender offer. The offer stated that the Board was considering actions to enhance shareholder values such as a recapitalization, a merger, or a leveraged buyout agreement. Burlington stated that:

The purpose of the ... Offer is to preserve the flexibility of the Company while the foregoing alternatives are being explored, to avoid any significant time delay in shareholders realizing the benefit of any such restructuring and to give shareholders desiring to receive cash for a portion of their shares an alternative to the inadequate Samjens Tender Offer, while permitting them to retain at the present time a continuing equity in the Company.

(Plaint. exh. 10, p. 4). The self-tender offer was originally set to expire on June 11, 1987.

On May 15, Samjens increased its tender offer from $67 to $72 per share. The expiration date remained June 3, 1987. On May 18, Robert Cotter, a representative of FB, contacted Tom Hill, a managing director of Shearson Lehman Bros., Inc., investment banker for Samjens. Cotter later spoke to Daniel Good, head of Shearson's merchant banking group. The parties agree that Hill told Good that events were moving rapidly and that if Samjens planned to do anything regarding its offer it should do so quickly. The parties dispute whether or not Good then told Hill that Samjens had made its best offer. This dispute cannot be resolved without live testimony.[5]

In a May 19 letter Edelman revealed his suspicion that Burlington was considering a competing bid. He demanded from Greenberg the opportunity to review and improve upon any offer Burlington received and intended to accept. Edelman also stated that it would be irresponsible for Burlington to enter into a "break fee" arrangement with another bidder.

Edelman's suspicions were correct. On May 20, 1987, Morgan and Burlington agreed to a merger agreement under which Morgan agreed to make a tender offer for all Burlington shares at $76 per share. Pursuant to the merger agreement, Burlington agreed to condition its self-tender offer on Morgan's failure to complete its tender offer.[6] Plaintiffs challenge three aspects of the agreement: 1) Section 6.3(b) which requires the Board to opt out of the North Carolina Shareholder Protection Act;[7] 2) Section 6.5 which prohibits the Board from soliciting other bids unless advised by counsel that its fiduciary duty requires it to do so (the "no-shop clause"); and 3) Section 8.3 which agrees to pay Morgan approximately $25 million if its tender offer fails (the "break-up fee") and to pay in addition up to $25 million in expenses.

The merger agreement was considered and approved by the Board at an all-day meeting on May 19 and another meeting on May 20, 1987. The following description of these meetings is based on the uncontradicted deposition testimony of various persons who were at the meetings. The May 19 meeting began with a briefing by independent counsel as to the Board's fiduciary duty. The investment bankers then informed the Board that they had discussed possible bids for Burlington with approximately 25 parties. Included among them were Citicorp, Kohlberg, Kravitch and Roberts, and Morgan. Although the former two parties had shown interest in bidding for Burlington, only Morgan had made a firm bid. The Board asked questions about

---

4. Not voluntarily, at least. On June 5, 1987, a judge in the Eastern District of North Carolina temporarily enjoined Samjens from pursuing its tender offer. The Fourth Circuit affirmed on June 22, 1987.

5. As the Court demonstrates below, the dispute need not be resolved in order to reach a decision in this case.

6. Thus, the expiration date of the self-tender offer has been extended to June 23, the expiration of Morgan's offer.

7. Plaintiffs have challenged the constitutionality of this statute in a related action. In addition, plaintiffs claim that Morgan is unfairly advantaged because another North Carolina statute, the Control Share Acquisition Act, does not apply to its agreement with Burlington. Plaintiffs have also challenged this statute.

Morgan's proposed price, its reputation, and its financing. It also pressed the bankers as to the likelihood of other offers, and was told that while there was interest, there were no other guaranteed offers. The Board was told that even if the other parties were to make bids, they would need time. In the early afternoon, the Board decided to begin negotiations with Morgan. It designated Joseph Barr, the senior independent director, to conduct the negotiations.

The deposition testimony of the persons at the negotiations unanimously indicates that negotiations with Morgan over the next two days covered four main topics: the fees, the no-shop clause, the price of the bid, and the financing. The Board rejected payment of a $7 million "hello fee" to Morgan just for entering into the agreement, and Morgan dropped the request. The Board also asked the bankers whether the break-up fee was standard practice and whether it and the other fees were too high. FB and KP did a survey of break-up fees in approximately 20 recent leveraged buyouts, and found that the one percent fee in the Morgan proposal was average. The Board was informed that Morgan was firm in its request for the fees, as they represented compensation for the risk that Morgan was taking in tying up its capital. The Board was unhappy with the original form of the no-shop clause, and insisted on inserting a condition that they could accept other bids if their fiduciary duty required it. Barr's testimony indicates that he understood this condition to mean that, if the Board received a higher bid than Morgan's, it could accept it. Finally, the Board negotiated a higher share price than Morgan had originally offered and satisfied itself that Morgan's financing was secure.

Two other topics received careful attention from the Board. First, the members inquired vigorously as to whether management had been guaranteed equity participation in the merged company, and were assured by management and Morgan representatives that there had been discussions but no agreement. Second, the Board considered whether to contact Samjens and inform it of the bid. FB and PK informed the Board, however, that Samjens had been contacted and did not plan to bid higher. The Board was informed of the May 19 letter from Edelman requesting that he be told of any prospective agreement or any higher bid, but did not understand the letter as a firm offer to raise Samjens' bid. The May 19 letter, it should be noted, does not state that Samjens was ready, willing, and able to raise its offer. The letter only requested a chance to "shop" any other bid. Board members indicated other reasons they were unwilling to contact Edelman: 1) Burlington had already offered Edelman a chance to receive information but he had not agreed to sign a confidentiality agreement; 2) Samjens had not terminated its tender offer as requested; 3) they suspected that Edelman used insider information in launching the tender offer; and 4) they did not want to risk antagonizing Morgan and losing its offer by allowing Edelman to review Morgan's bid and bid against it if he wished, as Edelman had requested.

After the Board meeting ended on May 19, representatives of the relevant parties continued to negotiate. On May 20, the Board met again. Board members met two hours before the meeting to read and discuss the proposed agreement. The meeting itself began with another briefing about the Board's fiduciary duty. The Board's counsel then went through the agreement section-by-section and explained it to the Board. The Board felt, based on advice from KP and FB, that Morgan wanted an answer that day, and voted to approve the merger agreement.

The next day, Morgan and Burlington announced the agreement. Their press release stated that Burlington would continue to be operated by senior management. The press release also stated, "Once the acquisition is completed, current senior management of Burlington will be invited to take an equity position in the company." (Plaint. exh., p. 35) Donald Brennan of Morgan stated that the press release was inaccurate and that a decision would not be made about the equity position until after a review of Burlington had been completed.

This, the evidence shows is the process Morgan follows in all of its mergers. The evidence indicates that although the parties reviewed the press release, Morgan's public relations firm wrote it.

Morgan commenced its $76 per share tender offer for Burlington on May 26, 1987. The offer expires at midnight on June 22, 1987. In conjunction with this, in a supplement to its self-tender offer, Burlington extended the self-tender offer to June 22, and recommended that its shareholders tender into the Morgan offer. On May 28, Samjens raised its tender offer to $77 per share and proposed a merger with Burlington similar to the Morgan agreement. On June 10, Morgan raised its offer to $78 per share. It remains the highest outstanding bid.

On June 5, 1987, the federal district court for the Eastern District of North Carolina enjoined Samjens from pursuing its tender offer for Burlington. It found that Burlington was likely to succeed on its claim that Samjens' tender offer was based on insider information. On June 22, 1987, the Fourth Circuit heard oral argument on Samjens' appeal from that order and affirmed.

### PRELIMINARY INJUNCTION

In order to obtain a preliminary injunction in this Circuit, a plaintiff must show: a) irreparable harm and b) either 1) likelihood of success on the merits, or 2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Jack Kahn Music Co. v. Baldwin Piano and Organ Co.*, 604 F.2d 755, 758 (2d Cir.1979).

### A. *Irreparable Injury*

■ Samjens has failed to prove irreparable injury. Since Samjens has been preliminarily enjoined from pursuing its tender offer for Burlington, it is not presently a competing offeror. Rather, it is a Burlington shareholder with a substantial stake in the company. It will thus not suffer irreparable injury if Morgan successfully completes its offer for Burlington because it is not permitted to purchase Burlington. Rather, if Samjens' claims are correct, and defendants have violated their duty of care and the federal securities laws, Samjens can pursue monetary damages like other shareholders.

The Court is also unwilling to grant equitable relief to Samjens in light of the North Carolina Court's ruling that there is a substantial likelihood that it launched its tender offer with inside information. Samjens comes to this Court seeking equity with "unclean hands": there has been a finding that it used insider information from a former Burlington executive in making its tender offer; it clearly harmed Burlington in doing so; and the merger agreement Samjens seeks to enjoin is, in part, a response to Samjens' tainted tender offer.

### B. *Likelihood of Success on the Merits/Sufficiently Serious Questions*

■ Alternatively, plaintiffs have failed the second prong of the test for a preliminary injunction.

#### 1. *Misrepresentations and Omissions*

Plaintiffs claim that defendants have violated the federal securities laws by failing to disclose management's alleged conflict of interest in the merger agreement, inadequately disclosing the purpose of the self-tender offer, and failing to comply with Securities and Exchange Commission Rule 13e–3, 17 C.F.R. § 240.13e–3.

Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e) reads in relevant portion:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading ... in connection with any tender offer or ... any solicitation of security holders in opposition to or in favor of any such offer....

A fact is material if there is a:

substantial likelihood that, under all the circumstances, the omitted fact would

have been viewed by the reasonable investor as having significantly altered the total mix of information made available. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 439, 96 S.Ct. 2126, 2128, 48 L.Ed.2d 757 (1976).

It is clear from the evidence—which includes the uncontradicted, sworn testimony of numerous Morgan and Burlington executives—that there is no agreement between Burlington management and Morgan regarding management's equity participation following the proposed merger. Rather, the parties have simply discussed the role management might have following the merger. These discussions are disclosed in both Morgan's tender offer and Burlington's May 26, 1987 supplement to its self-tender offer. The May 26 supplement, in which the Board recommends Morgan's offer, reads in pertinent part:

> Morgan Stanley representatives indicated their willingness to allow certain members of the Company's management to purchase equity interests in Holdings at the same price paid by Morgan Stanley in the initial capitalization of Holdings. No agreement was or has been entered into between Holdings and any members of the management of the Company concerning any such equity purchases, and no discussions or negotiations regarding these matters are anticipated to occur during the pendency of the Offer. The purchase by any member of management of the Company of an equity interest in Holdings is not a condition to the completion of the Morgan Stanley Offer or the Merger by Holdings or BII Acquisition.

(Plaint. exh. 16, p. 3). Morgan's tender offer contains a similar passage (Morgan Stanley exh. 2, p. 19).

Plaintiffs' claim regarding disclosure of the purposes of the partial self-tender offer is similarly without merit. The self-tender offer states that Burlington's Board was considering various alternatives to enhance shareholder value:

> The purpose of the Company Offer is to preserve the flexibility of the Company while the foregoing alternatives are being explored, to avoid any significant time delay in shareholders realizing the benefit of any such restructuring and to give shareholders desiring to receive cash for a portion of their Shares an alternative to the inadequate Samjens Tender Offer, while permitting them to retain at the present time a continuing equity interest in the Company.

(Plaint. exh. 9, p. 4). Plaintiffs allege that although preserving flexibility is the stated purpose of the self-tender offer, the offer does not state what flexibility is needed for or how it will be used. The above quoted passage, however, indicates that the flexibility is needed to allow the Board time to consider alternatives to an inadequate offer and that such flexibility will give more options to shareholders.

Plaintiffs also claim that the purpose of the self-tender offer was misrepresented, and that, in fact, the self-tender offer was meant to serve some purpose other than flexibility. This is merely an allegation, as there is no showing of this in the record. Plaintiffs might be arguing that the true purpose of the self-tender offer was to ward off the Samjens' offer. But the self-tender offer disclosed the existence of the Samjens' tender offer and the fact that it was conditioned upon receipt of at least 80 percent of outstanding Burlington shares. Thus, any reasonable shareholder would realize that if more than 20 percent of outstanding Burlington shares were tendered into the self-tender, it would defeat the Samjens' tender offer. This Court will not require Burlington to restate the obvious. *See Raybestos-Manhattan, Inc. v. Hi-Shear Industries, Inc.,* 503 F.Supp. 1122, 1131 (S.D.N.Y.1980).

Finally, plaintiffs argue that in light of the merger agreement, the need for flexibility has become moot. Burlington has dealt with this in the May 26 supplement to the self-tender offer:

> At its meeting on May 20, 1987, the Company's Board of Directors determined not to terminate at this time the Company Offer in order to preserve the flexibility of the Company during the period the Morgan Stanley Offer remains

open. However, in accordance with the Merger Agreement and as set forth in this Supplement, the Company will not accept for payment or pay for any Shares tendered pursuant to the Company Offer unless the Morgan Stanley Offer, once commenced, is terminated without any Shares being purchased pursuant thereto. Thus, if the Morgan Stanley Offer is successfully completed, no Shares will be purchased under the Company Offer and the Company Offer will be terminated. Accordingly, the Board does not recommend that shareholders tender any of their Shares pursuant to the Company Offer at this time.

(Plaint. exh. 16, pp. 5–6). This statement fully discloses the purpose of the self-tender in light of the merger agreement, and advises shareholders accordingly.

Plaintiffs also contend that the merger agreement is a Rule 13e–3 transaction in that it is a tender offer made by the issuer or an affiliate and will reduce the number of stockholders to less than 300 or cause the delisting of the securities in issue. Plaintiffs claim the evidence establishes the elements of this claim in that: 1) the merger will reduce the number of stockholders to below 300; 2) Burlington is under the common control of Morgan and management; and 3) Burlington senior management will control the "new" Burlington. Plaintiffs did not raise this claim in their complaint, but did so for the first time in their motion papers, which the Court reviewed on June 15, 1987. In view of the short time between the filing of the complaint (May 29, 1987) and the filing of the motion, the fact that defendants were not put on notice of this claim during discovery, and the serious remedy plaintiffs seek, it would be unfair for the Court to consider this claim.

## 2. The Merger Agreement

Plaintiffs claim that the Board violated its duty to Burlington shareholders by failing to conduct a required auction for Burlington and by considering the Morgan merger agreement in a hasty, perfunctory, and biased manner. Plaintiffs claim that in approving the break-up fees, expense arrangements, and the no-shop provisions, the Board breached its fiduciary duty to the shareholders.[8]

In discharging its function of managing a corporation, a board of directors owes a duty of care to act in the best interests of the shareholders. *Revlon, Inc. v. MacAndrews & Forbes Holdings,* 506 A.2d 173, 179 (Del.1986). This duty of care also requires the board to protect the corporate enterprise from "harm, reasonably perceived, irrespective of its source." *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985). Such a threat includes a hostile takeover at a price below a company's value. *Revlon,* 506 A.2d at 181.

The "business judgment rule" protects the decisions of the board in carrying out its duty of care if certain requirements are met. *Id.* at 180. Both the duty of care and the business judgment rule apply when the board is responding to a hostile tender offer. *Id.; Unocal,* 493 A.2d at 954. The board's decisions, however, are subject to closer scrutiny in such a context. "[T]here is an enhanced duty which calls for judicial examination at the threshold before the protection of the business judgment rule may be conferred." *Unocal,* 493 A.2d at 954. Directors must show "that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership." *Id.* at 955. The board can satisfy this burden by showing good faith and reasonable investigation, and such proof is enhanced when a board is comprised of a majority of outside directors. *Id.*

In the midst of a takeover battle, when it becomes obvious that a company is for sale—when, for example, the board authorizes management to negotiate a merger or buyout with a third-party —the duty of the board shifts. "The directors' role

---

**8.** The parties agree that since Burlington is incorporated in the state of Delaware, Delaware law applies. *See Zion v. Kurtz,* 50 N.Y.2d 92, 100, 428 N.Y.S.2d 199, 405 N.E.2d 681 (1980).

change[s] from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Revlon*, 506 A.2d at 182.

■ In coordinating the bidding process, the board can institute strategies, such as granting a "lock-up" agreement, a break-up fee, or a no-shop agreement to a "white knight", but only if their strategies enhance the bidding. *Id.* at 183, 184. Such arrangements may also be legitimately necessary to convince a "white knight" to enter the bidding by providing some form of compensation for the risks it is undertaking. *Id.* Arrangements which effectively end the auction, however, are generally detrimental to shareholders' interests and not protected by the business judgment rule. *Id.* at 181, 183.

■ The board is under a further duty, when conducting the auction, to deal fairly with the bidders. It cannot deal selectively to fend off a hostile bidder. *Id.* at 182.

> Favoritism for a white knight to the total exclusion of a hostile bidder might be justifiable when the latter's offer adversely affects shareholder interests, but when bidders make relatively similar offers, or dissolution of the company becomes inevitable, the directors cannot fulfill their enhanced *Unocal* duties by playing favorites with the contending factions. Market forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity.

*Id.* at 184. Applying these factors to this case yields the following results.

### a. *The Composition of the Board*

The evidence indicates that the Board is composed of 13 directors, ten of whom are outside directors. Negotiations between the Board and Morgan were carried out by the senior outside director. All relevant decisions were made by the outside directors, and they were advised by outside counsel and investment bankers. There is no evidence of self-dealing or bad faith on the part of the Board and its members.

### b. *The Board's Response to Takeover Rumors*

■ The Board was first informed of the rumors that Edelman was interested in Burlington at a meeting on April 15, 1987. It approved the hiring of investment bankers and counsel. The Board did not instruct management to approach Edelman, nor had Edelman contacted management.

### c. *The First Samjens Tender Offer*

The Board met five days after the first Samjens offer. After viewing a long, division-by-division presentation about the value of Burlington, the Board rejected the $67 offer as inadequate. The Board then authorized the investment bankers to negotiate with other parties, and authorized the self-tender offer. The self-tender did not foreclose bidding, and in fact seemed to enhance it—Samjens followed soon after by raising its initial bid to $72 per share. At this point, the auction had not yet begun. Although the Board had authorized its investment bankers to negotiate with interested parties, it still preserved the right to seek other alternatives to maximize shareholder value. The Board was still entitled to act in a defensive posture to ward off what it deemed, after due deliberation, to be an inadequate tender offer.

### d. *The Approval of the Morgan Stanley Merger Agreement*

On May 19, the Board was informed that approximately 25 entities had expressed interest in Burlington. Only Morgan, however, was willing to make a bid. When the Board decided to enter into negotiations with Morgan, it was clear that Burlington would be sold, the auction began, and the Board was no longer defending the company, but attempting to get the best bid for it. The evidence indicates the Board fulfilled its duty to do so.

The negotiations with Morgan lasted for two days. The Board members read the merger agreement carefully and went through it with outside counsel. The price the Board secured from Morgan was $76 per share, $4 per share higher than the highest outstanding bid.

The Board negotiated strictly with Morgan about the other terms of the agreement. It rejected the $7 million hello fee. The Board was not happy with the breakup fee, but after investigating it, the Board realized that such a fee was standard, and that the amount of the fee was fair and within the normal range. The Board also realized that Morgan would back out of the deal without the fee, and justifiably decided to agree to it. The Board also insisted on changing the no-shop clause to a "window-shop" clause. The new clause allows the Board to look at other bids, but not solicit them. If the Board sees a higher bid, it can accept it.

The merger agreement is not so onerous as to end the auction or exclude other bidders. The breakup fee and related expenses total approximately 2 percent of the value of the company, leaving other parties free to bid. There is also no auction-ending lock-up agreement. In fact, the merger did not end the auction: in response to the merger, Samjens increased its bid to $77, and Morgan has responded with a bid of $78. Thus, the merger agreement has increased the value to the shareholders by $6 per share, and Samjens has hinted that it might make a higher bid.

The evidence also indicates that the Board reached all of its decisions after thorough consultation with its financial and legal advisors. Its decisions were based on reasonable and thorough investigations, and its conclusions were justifiable and in good faith. The Board did not rush. Its investment bankers solicited bids over an eight day period. When the Board was assured that Morgan's bid was the best, it pursued its negotiations with Morgan over a two-day period. The Board fulfilled its duty of care in the takeover contest, and its decision is entitled to the protection of the business judgment rule. In short, if the procedure the Board followed and the merger agreement it approved were not protected by the business judgment rule, the Court doubts that any merger agreements would ever be allowed in the context of takeover contests. This case indicates that this would be detrimental to shareholders. The merger agreement approved in this case has resulted, so far, in an increase of $6 per share in the price that will be paid to shareholders.

Plaintiffs' version of how the auction should have been conducted is unrealistic and ignores a number of important factors. First, the Board was operating under time pressure caused by Samjens. The Samjens offer was to expire on June 3. Thus, when the Board met on May 19, it had only two weeks to find an alternative to an inadequate bid. Morgan was the only party ready to make a bid, all other parties needed additional time. Second, although Morgan might have been Burlington's white knight, it was not Burlington's patron saint. Morgan was involved in negotiations with Burlington because it saw an opportunity to make money. Thus, it wanted a response to its bid quickly, it wanted compensation for the risk it was undertaking in tying up its capital, and it did not want to serve as a "stalking horse" and have its bid shopped around. In light of this, however, the Board spent two days negotiating the merger agreement, and bargained vigorously with Morgan.

### e. *Dealings with Edelman*

Plaintiffs claim that the Board was biased, and should have contacted Edelman before accepting the bid from Morgan. The reasons the Board did not contact Edelman were stated earlier. Even if the Board was incorrect in understanding that Samjens did not plan to make another offer, the failure to contact him was still justified. Management had offered to provide Edelman with the same information it had given other interested parties, but Edelman refused to sign a confidentiality agreement. Edelman wanted to be informed of other bids before he bid, but the Board justifiably thought it would be unwise to do so. The Board did not deal selectively with Edelman. Instead, he dealt selectively with the Board, according to his own rules. Nor did the Board freeze Edelman out of the auction. The merger agreement the Board signed did not end the auction, it provided a starting point for further bidding. Edelman was free to—

626

and did—raise his bid after it was signed. If the Board was unfair with Edelman, it was only because it forced him to dig deeper into his pockets to the benefit of Burlington shareholders.

Samjens also complains that the Board has not offered it a break-up fee and therefore has treated it unfairly. It complains that if it purchases Burlington, it must pay a $50 million penalty due to the expense and break-up fee provisions. Samjens forgets, however, that it has purchased approximately 13 percent of Burlington shares in the pre-tender offer market at an average price of $50 per share. Thus, Samjens enters the bidding process with a nearly $80 million advantage over other prospective bidders who must pay at least $78 per share for all outstanding shares. Denying Samjens a break-up fee thus helps to even the playing field.

Edelman also complains that the Board has opted out of the North Carolina Shareholder Protection Act for the Morgan offer but not for his offer. It is clear that the Board could not have reached agreement with Morgan had it not opted out of the Act. By opting out, the Board was not acting selectively to freeze Edelman out. Rather, it was enhancing the bidding by securing a $76 bid from Morgan. Although Burlington has refused to opt-out for Edelman's bid so far, there is no evidence that it would continue to do so if Samjens approved its bid.

### 3. *The Self-tender offer*

The plaintiffs claim that the self-tender offer violates the Board's fiduciary duty. They did not bring this claim in their complaint. Nevertheless, the Court will consider it because many of the allegations regarding the breach of duty are related to plaintiffs' securities law claims involving the self-tender. Furthermore, the failure to plead it has worked to the plaintiffs' detriment, as they have not developed the factual record necessary to sustain the claim. *See AC Acquisitions v. Anderson, Clayton and Co.*, 519 A.2d 103, 113–114 (Del.Cha.1986) (ruling based, in part, on well-developed factual record as to the post self-tender share price).

Defensive measures enacted by a board of directors in response to a hostile tender offer must meet a two-part test: there must be a basis for the board to have concluded that the defensive measure served a proper corporate purpose and the measure must be reasonable in light of the threat posed. *Id.* at 112.

When the Burlington Board first issued the self-tender offer, it was in response to a threat to Burlington shareholders: an inadequate tender offer. The self-tender was designed so that if the maximum number of shares were tendered, the inadequate tender offer would be defeated. The self-tender was thus enacted for a legitimate purpose. It also was reasonable in light of the threat. It was designed to allow the Board time to consider alternatives that would maximize shareholder value. There is also no evidence that the original tender offer was structured such that no rational shareholder could turn it down. There is no evidence that the price of Burlington shares would have droped drastically after the self-tender such that a shareholder would have to tender into it to preserve any value. Furthermore, the self-tender was to expire on June 11, eight days after the first Samjens offer expired. This allowed shareholders more time to consider their options.

The original status of the self-tender offer, however, is not relevant. After Burlington entered into the merger agreement with Morgan, it extended the self-tender offer until after the Morgan offer expired. Burlington also announced that if the offer for Morgan were successful, Burlington would terminate the self-tender offer. Burlington also recommended that shareholders accept the Morgan offer. In light of the preliminary injunction against Samjens' offer, shareholders have the choice between tendering into the Morgan offer or, against the recommendation of Burlington, tendering into its self-tender. The self-tender is thus out of the picture.

## CONCLUSION

The Court has found that the plaintiffs are not threatened with irreparable injury and are not likely to succeed on the merits of their claims. The motion for a preliminary injunction is thus denied.

SO ORDERED.