**In re INTEGRATED RESOURCES, INC., Debtor.**

**Bankruptcy No. 90–B–10411.**

United States Bankruptcy Court, S.D. New York.

Jan. 13, 1992.

See also 123 B.R. 181.

Willkie Farr & Gallagher by Myron Trepper, Alan Lipkin, Michael Kelly, Jeanne Luboja, New York City, for debtor.

Berlack, Israels & Liberman by Edward Weisfelner, Steven Greenbaum, Carole Fern, New York City, for Official Subordinated Bondholders Committee.

Kramer, Levin, Nessen, Kamin & Frankel by Kenneth Eckstein, New York City, for Official Committee of Senior Public Debt and Commercial Paperholders.

Wachtell, Lipton, Rosen & Katz by Chaim Fortgang, Howard Glazer, New York City, for Official Committee of Holders of Bank Debt.

Cleary, Gottlieb, Steen & Hamilton by Thomas Moloney, New York City, for Bankers Trust New York Corp.

## MEMORANDUM DECISION ON MOTION FOR APPROVAL OF BREAK-UP FEE AND EXPENSE REIMBURSEMENT AGREEMENT

CORNELIUS BLACKSHEAR,
Bankruptcy Judge.

### BACKGROUND

On February 13, 1990 (the "Petition Date"), Integrated Resources, Inc. ("Integrated") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). Integrated continues in possession of its properties and management of its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The United States Trustee has appointed three creditors' committees (the "Creditors' Committees") to serve in this case: (1) Committee of Holders of Bank Debt (the "Bank Committee"); (2) Committee of Senior Public Debt and Commercial Paper Holders (the "Senior Debt Committee;" together with the Bank Committee, the "Senior Committees"); and (3) Committee of Subordinated Public Debt Holders (the "Sub–Debt Committee"). This Court appointed Karen Gross as Special Representative for certain partnerships sponsored by Integrated for which there is no counsel of record in this case.

Integrated is primarily a holding company which owns operating companies that, prior to the Petition Date, engaged in, *inter alia,* the operation of life insurance companies; the organization, management and sale of direct participation investment programs; and the provision of investment counseling and money management services for private accounts and mutual funds sponsored by Integrated. Since filing for bankruptcy protection, Integrated has attempted to streamline its operations and reduce costs, and towards that endeavor, Integrated has sold or otherwise disposed of several lines of business. Integrated continues to manage its partnership-related businesses, equipment leasing business, contract rights operations, certain operating subsidiaries and other less significant assets.

Integrated has been attempting to formulate a plan of reorganization since early in this case. Initially, and for the greater part of this case, the Debtor had desired a "Stand–Alone," or internally funded, plan. However, the Senior Committees and the Debtor were in discord regarding the ability of the Debtor to confirm and consummate such a plan. In fact, the disharmonious relationship between Integrated and the Senior Committees, which was evident to the Court, became increasingly acrimonious as the case continued. In June 1991, with the desire to ameliorate the then-existing impasse to a consensual plan, this Court terminated the application of the exclusive period as to the Creditors' Committees in this case.

Since that point, Integrated has pursued third party funding of a plan of reorganization in an effort to bridge key issues dividing Integrated and the Senior Committees. Integrated contacted numerous potential third party plan funders. When such entities demonstrated serious interest in funding a plan, Integrated entered into confidentiality agreements with such entities to permit them to perform due diligence while safeguarding the Debtor.

On or about January 23, 1991, Integrated entered into a confidentiality agreement with Bankers Trust New York Corporation ("Bankers Trust") to enable Bankers Trust to proceed with due diligence regarding potential plan funding. After Bankers Trust expressed serious interest in funding a plan, Integrated filed a motion for authorization to enter into an agreement to reimburse expenses of due diligence incurred by Bankers Trust. The motion was withdrawn after the Creditors' Committees voiced strenuous objection. Nonetheless, Bankers Trust continued to proceed on an

interim basis without expense reimbursement.

Bankers Trust eventually made a proposal to fund a plan of reorganization. After negotiation with the Debtor and Senior Committees, the offer was improved to a level where it was acceptable to those constituencies.

On November 25, 1991, this Court conducted a hearing on a motion for an order authorizing Integrated to enter into a break-up fee and expense reimbursement agreement (the "Break-up Fee") with Bankers Trust. The Break-Up Fee is a component of the proposal made by Bankers Trust and a condition precedent to the funding of a plan of reorganization. The motion was supported by the Senior Committees. The motion was vigorously objected to by the Sub–Debt Committee.

The November 25, 1991 hearing encompassed many hours, testimony, documentary evidence, and over 260 pages of transcript.

## THE BREAK–UP FEE

The Break–Up Fee, as explained in Integrated's moving papers, provided: (1) $500,000 if the Bankers Trust proposal is abandoned because Integrated and the Senior Committees find the list of Integrated subsidiaries that Bankers Trust requires to file bankruptcy petitions unacceptable (one of the conditions of the plan funding proposal); (2) $2,000,000 if Integrated and the Senior Committees (a) elect to terminate ("Termination Election") negotiations with Bankers Trust concerning the Definitive Agreement by the later of December 15, 1991 and the fourteenth day after Bankers Trust delivers a draft of the Definitive Agreement, and (b) prior to February 15, 1992, do not agree to pursue an Alternative Transaction with a party other than Bankers Trust; (3) $4,000,000 if (a) the Termination Election is not made or an Alternative Transaction is agreed upon prior to February 15, 1992, and (b) no Definitive

Agreement with Bankers Trust has been executed; and (4) $9,000,000 if and when the Definitive Agreement has been executed.

Accordingly, the Break–Up Fee would be payable if (1) Integrated enters into an Alternative Transaction; (2) a plan of reorganization based on the Bankers Trust proposal or the Definitive Agreement is abandoned; or (3) the creditors of Integrated receive a material dividend or distribution respecting their claims. The Break–Up Fee would not be payable if Bankers Trust: (1) abandons its proposal because of a material adverse change, or exercise of the Due Diligence Out,;[1] (2) fails to obtain any necessary regulatory approvals; or (3) is in material breach of the proposal or the Definitive Agreement.

An additional requisite of the Bankers Trust proposal provides that upon execution of a Definitive Agreement, Integrated and the Senior Committees shall not solicit or initiate the submission of offers to engage in or enter into an agreement to pursue an Alternative Transaction. The Creditors' Committees would not be prohibited from holding discussions or negotiations with any parties who initiate or with whom they are currently having negotiations. Subject to the foregoing, Integrated and the Senior Committees would retain the right to proceed with any Alternative Transaction so long as the consideration paid to Integrated pursuant to any Alternative Transaction occurring after the Definitive Agreement is signed exceeds the cash portion of the plan funding proposal by no less than $20,000,000.

## EXPENSE REIMBURSEMENT

Under the Bankers Trust proposal, Bankers Trust would be paid $250,000 promptly as partial reimbursement for certain of its reasonable out-of-pocket expenses incurred in connection with the development and implementation of the Bankers Trust proposal. Additionally, Bankers Trust would

---

1. The "Due Diligence Out" provides Bankers Trust with the ability to withdraw from its proposal if it advises Integrated on or before January 15, 1992, that a matter has come to its attention that would materially adversely affect the value of a New Integrated and its subsidiaries, taken as a whole, to Bankers Trust.

receive up to an additional $1,250,000 for the remainder of such expenses if the proposal is abandoned for any reason.

## LAW

When a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold. Jerome and Drain, *Bankruptcy Court Is Newest Arena For M & A Action*, N.Y.L.J., June 3, 1991, at 8, col. 4. In general, to receive approval of a proposed sale of assets, the debtor will need to demonstrate to the bankruptcy court that the proffered purchase price is the highest and best offer. These tenets also apply to the outright purchase of a debtor or its primary assets, as well as the effective acquisition of a debtor through the funding of a plan of reorganization.

In order to encourage the making of bids, debtors entice potential purchasers by utilizing various incentives, such as break-up fees, topping fees and expense reimbursement agreements. A "break-up fee" is a fee paid to a potential acquiror of a business, or certain assets, by the seller, in the event that the transaction contemplated fails to be consummated and certain criteria in the purchase agreement are met. The condition most commonly giving rise to the payment of a break-up fee is the seller's acceptance of a later bid. Break-up fees may take the form of paying the out-of-pocket expenses incurred in arranging the deal, including due diligence expenses, or break-up fees may be wholly independent of the transaction costs. For example, a break-up fee may include compensation for a bidder's lost opportunity costs. *In re 995 Fifth Avenue Associates, L.P.*, 96 B.R. 24, 29, n. 6 (Bankr.S.D.N.Y.1989).

There are several reasons why a seller is willing to agree to a break-up fee. Such fees may encourage the making of what is colloquially referred to as a "stalking horse" offer, which is an initial bid that is then "shopped around" to attract higher offers. *In re Marrose Corp.*, Case Nos. 89 B 12171–12180 (Bankr.S.D.N.Y. February 14, 1991). Absent a break-up fee, bidders are often reluctant to make the first bid for fear that it will be shopped around and "topped" by an entity relying on the initial offeror's due diligence. Further, a break-up fee may discourage a bidding strategy designed to hold back competitive bids until later in the process and aid the seller in negotiating an initial high bid.

In the nonbankruptcy context, courts have generally recognized that break-up fees are common in corporate transactions. *See e.g., Cottle v. Storer Communications, Inc.*, 849 F.2d 570 (11th Cir.1988); *CRTF Corp. v. Federated Department Stores*, 683 F.Supp. 422 (S.D.N.Y.1988); and *Samjens Partners I v. Burlington Indus.*, 663 F.Supp. 614 (S.D.N.Y.1987).

In the context of an asset sale, such fees are presumptively appropriate under the business judgment rule and nonbankruptcy courts rarely rule on their propriety. Berman, *Using Bidding Incentives In Bankruptcy Asset Sales*, N.Y.L.J., May 9, 1991, at 5, col. 1. However, the dominant issue that faces a court when determining the propriety of a break-up fee is whether the offer made by the party seeking the fee will enhance or hinder the bidding process. If the break-up fee encourages bidding, it will be approved, if it stifles bidding, it will not be approved.

A break-up fee may discourage an auction process and preclude further bidding when the fee is so large as to make competing bids too expensive. *See Revlon Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.Sup.1985).[2] Thus, when the fee is so large that it chills the bidding process, it will not be protected by the business judgment rule.

When a sale of the debtor's assets outside the ordinary course of business is proposed, Code § 363, bankruptcy courts will carefully scrutinize the use of break-up fees. This is because bidding incentives

---

**2.** In *Revlon,* the court rejected a $25,000,000 break-up fee, holding that it was put in place merely to make the transaction so expensive to the unwanted suitor and designed to preclude further bidding. *Revlon* at 185.

impose expenses on the debtor's estate, and do not merely affect shareholders as in the corporate control cases, but affect the debtor, creditors and equity holders, alike.

In *In re 995 Fifth Avenue Associates, L.P.,* a $500,000 break-up fee was approved by the bankruptcy court after the $76,000,-000 sale of the Stanhope Hotel. The court noted: (1) that the spirited auction for the sale of the hotel was a direct result of the earlier bid submitted by the losing offeror seeking the break-up fee; (2) the lack of self dealing, bad faith, fraud, and unfair dealing; (3) arms length negotiations; (4) the reasonableness of the fee in relation to the size of the sale; (5) the costs incurred by the unsuccessful bidder in making its bid; and (6) the agreement had been carefully scrutinized by the creditors' committee. Further, the court declined to limit the amount of the break-up fee to the out-of-pocket expenses of the losing bidder.

In *In re Crowthers McCall Pattern, Inc.,* 114 B.R. 877, 879 (Bankr.S.D.N.Y. 1990), the court approved a $500,000 break-up fee in a $45,000,000 sale, without any discussions of the fee on the merits. The court also authorized a bidding increment limitation which provided that competing bids could be made only if they exceeded the earlier bid by a $500,000 increment.

In *In re McLean Indus.,* Case Nos. 86 B 12238–12241 (HCB) (Bankr.S.D.N.Y.), the court approved an expense reimbursement agreement prior to the purchaser agreeing to proceed with the sale process.[3]

This Court has approved break-up fee and expense reimbursement agreements in several cases, including the Integrated bankruptcy. In *In re Marrose Corp.,* this court discussed break-up fees and specifically stated that such agreements are permissible to the extent that they enhance the bidding to the benefit of the creditors of the estate. *Id.* at 13. In that case, a reimbursement fee was denied to an unsuccessful bidder on the basis that its bid did not serve as a "stalking horse" and "did not enhance the bidding process" as contemplated by the expense reimbursement provisions of the offer.[4]

In *In re T.V.S.I. Holdings, Inc. et al.,* Nos. 90 B 13581–13586, 90 B 13856–13864 (CB) (Bankr.S.D.N.Y.1991), this Court approved a break-up fee agreement of $3,500,000 in a transaction involving cash consideration of approximately $30,000,-000., preferred stock of the acquiror's parent to satisfy approximately $108,000,000 in debentures, and assumption of pre-petition, post-petition and going-forward obligations of the debtor.

Similarly, this Court has approved expense reimbursement agreements between the instant debtor and potential purchasers of specific assets.

### THE HEARING

On November 25, the contentious, multiple hour hearing continued late into the evening. The Debtor urged that court authorization of the Break–Up Fee was an immediate necessity because the Bankers Trust plan funding proposal would expire by its terms on the hearing date absent authorization of the inducement. The Debtor explained that the Break–Up Fee and expense reimbursement agreement was the product of intense negotiations conducted primarily between the Senior Committees and Bankers Trust, and therefore, was not tainted with any self-interest on the part of Integrated senior management. The Debtor extolled the virtues of Bankers Trust and the "maturity" of its

---

3. This is the same method that was used in the case, *sub judice,* and would seem to be the more appropriate process. It gives parties in interest an opportunity to object to the bidding incentive agreement before the auction or hearing to approve the sale. Further, it gives the offeror an *instant incentive to commit additional resources* to the consummation of a sale.

4. In *Marrose,* after the unsuccessful bidder (seeking the break-up fee) left the bidding process, having been unable to deliver proof that required financing was in place, the successful bidder renegotiated its purchase price down. It was only after another bidder was brought in and a new auction held, that the price was increased somewhat. Since the winning bid did not occur "primarily because of" the role of the party seeking the fee, the fee was denied.

funding proposal. According to the Debtor, the long-term, almost continuous, involvement of Bankers Trust beginning with a confidentiality agreement in January 1991 and initial offer in June 1991, makes the recent proposal and request for a break-up fee credible. That Bankers Trust has already committed substantial time and money to submit a funding proposal which involves a large and complex transaction without the comfort of an expense reimbursement agreement, gives credence to the request before the Court.

On the other hand, the Sub–Debt Committee vehemently argued that the Court must not approve the Break–Up Fee because it is not in the best interests of the estate and not appropriate under relevant law. The Sub–Debt Committee agreed that the appropriate test applied to a request for authorization to execute a break-up fee agreement is the business judgment of the debtor. However, the Committee urged that the business judgment standard does not apply when it is tainted with the self interest of those exercising the judgment. It was argued that a suspect relationship existed between senior management of Integrated and senior level personnel at Bankers Trust working on the proposal. It was particularly alleged that Integrated senior management was negotiating a "sweetheart deal" for itself, and in so doing, had treated Bankers Trust more favorably than other potential suitors of the Debtor. According to the Sub–Debt Committee, an unlevel playing field has resulted and, therefore, the taint of the alleged self interest of Integrated senior management should negate any application of the business judgment rule to the Court's review of the Break–Up Fee request.

Further, the Sub–Debt Committee maintained that the Break–Up Fee would not enhance the bidding process and would chill competitive bidding due to its onerous (expensive) provisions, which includes the incremental bid increase requirement of $20,000,000.

The Sub–Debt Committee argued that the Break–Up Fee should be denied because it is unreasonably high in proportion to the amount of the funding being supplied by Bankers Trust. Although the proposal contemplates a funding amount of $565,000,000, Bankers Trust would only invest approximately $190,000,000 out of pocket;[5] therefore, a maximum break-up fee of $9,000,000 would far exceed the average fee as a percent of acquisition price that has been authorized in other cases. The Sub–Debt Committee also objected to the provisions of the Break–Up Fee which permitted payment of a fee before a definitive agreement.

Another potential suitor of the Debtor, Penguin Group, filed an objection to the motion to approve the Break–Up Fee and expense reimbursement agreement and appeared at the Hearing. Penguin argued that the provisions of the agreement were onerous and would chill the bidding process, rather than enhance it. Penguin also informed the Court of their recent proposal to fund a plan of reorganization and their belief that it was a higher and better offer than that submitted by Bankers Trust.

At the conclusion of all testimony, documentary evidence and oral argument, this Court determined that there were problems with the Break–Up Fee and would not authorize it in its then-existing form. The Court's concern lay with the amounts of the segments of the Break–Up Fee, rather than the other issues raised by the Sub–Debt Committee. Thereafter, the Court permitted additional argument and then retired to chambers to give the parties an opportunity to come up with a Break–Up Fee proposal with which the Court would feel comfortable.

After a brief recess, the Debtor and Bankers Trust submitted an identically structured proposal as presented before; however, with a significant downward adjustment of the segmented dollar amounts

---

5. The Debtor is expected to have cash on hand of anywhere from $350,000,000 to $400,000,000 at closing. Bankers Trust's offer contemplates a total value of $565,000,000; therefore, if there is less cash on hand, Bankers Trust will have to make a larger cash contribution, and if there is more cash on hand, it will have to make a smaller cash investment.

of the Break–Up Fee payable thereunder. Specifically, the $9,000,000 payable after a definitive agreement was lowered to $6,000,000; the $4,000,000 payable if no Termination Election is exercised and no definitive agreement entered into by a date certain was decreased to $2,500,000; the $2,000,000 payable upon a Termination election by a date certain was decreased to $1,250,000; and further, the incremental bid increase requirement was lowered from $20,000,000 to $15,000,000.

This Court approved the Break–Up Fee as modified. There were several reasons for the approval. The support of the Senior Committees for the original Break–Up Fee proposed by the Debtor gave this Court comfort in light of the historically acrimonious relationship that exists between these parties. This Court did not find the allegations of a "sweetheart deal" between Integrated management and Bankers Trust supported by the record. Also compelling was the fact that other suitors had requested significant break-up fees and expense reimbursement, including the Penguin and Hallwood Groups.[6] Therefore, the request was not *sui generis* to Bankers Trust.

## CONCLUSION

In the end, the business judgment of the Debtor is the standard applied under the law in this district. Nonetheless, the subject court is charged with the duty of reviewing the agreement to determine that it is reasonable in relation to the bidder's efforts and the magnitude and significance of the transaction, and will enhance rather than detract from the bidding process. *Samjens Partners I*, at 624–25; *In re 995 Fifth Avenue Associates*, at 28; *Marrose*, at 13. Integrated's business judgment, coupled with the support of the Senior Committees, and the modification of the Break–Up Fee convinced this Court that

approval of the agreement was appropriate under the circumstances.

---

**6.** Steven Weinroth, Chairman and CEO of Integrated, testified that, to the best of his recollection, an earlier proposal by Hallwood had provided for a $4,000,000 break-up fee, and the current proposal by Penguin provided for a break-up fee of $8,500,000 and expense reimbursement of $2,000,000. *Tr.* at 63.