**In re 995 FIFTH AVENUE ASSOCIATES, L.P.,**
**Debtor.**

**Bankruptcy No. 88 B 10237(TLB).**

United States Bankruptcy Court,
S.D. New York.

Feb. 10, 1989.
As Amended Feb. 16, 1989.

Haythe & Curley by Michael Blumenthal, New York City, for Stanhope Interstate Associates, L.P.

Paul, Weiss, Rifkind, Wharton & Garrison by Joseph Samet, Robert Laufer, New York City, for Centrust Services, Inc.

Angel & Frankel, P.C., by Joshua Angel, Ira Abel, New York City, for debtor.

Wachtell, Lipton, Rosen & Katz by Theodore Gewertz, New York City, for Ensign Bank, N.A.

White & Case by Allan Gropper, New York City, for American Stanhope Partners.

Charles H. Weintraub, New York City, for Hopeful Enterprises, Inc.

Myerson & Kuhn by Leon Marcus, Paul Silverstein, New York City, for Committee of Unsecured Creditors.

## MEMORANDUM DECISION FIXING AMOUNT OF BREAKUP FEE

TINA L. BROZMAN, Bankruptcy Judge.

At the end of November, 1988, I conducted an auction of and confirmed the sale for $76,000,000 cash to Tobishima Associates, Ltd. (Tobishima) of the debtor's interest in the Stanhope Hotel. In addition to authorizing the sale of the building, furniture, fixtures and equipment, I authorized the debtor to assume and assign to Tobishima certain executory contracts, including the ground lease for the hotel.[1] At the conclusion of the auction I authorized the payment of a breakup fee to the outbid contract vendee, Stanhope Interstate Associates, L.P. (SIA), in an amount to be determined after submission to me of documentation respecting out-of-pocket expenses.

As a condition to the award, SIA agreed to furnish a letter indicating that it had had the ability to have wire transferred to the debtor, had SIA been the successful purchaser, the $1,000,000 posted by the seven other bidders. This memorandum decision will explain the basis for the award which I am making.

The spirited auction was the direct result of a contract of sale by and between the debtor and SIA (the Revised Contract). The Revised Contract established an upset price of $62,004,038.97 in cash plus a nonrecourse note in the amount of $11,720,-961.03 to be secured by a second mortgage on the hotel which would be subordinated to a first mortgage in the amount of $65,-300,000.

Gerald Guterman, the president of the debtor's general partner, was to obtain an equity interest in the SIA venture if SIA were the successful purchaser. The Revised Contract provided that if there were delivered to the debtor, the committee of unsecured creditors (the Committee) and me a letter from an investment banker, mortgage broker or lending institution stating that it is "highly confident" that the necessary financing can be raised on the security of the hotel premises, there would be paid to SIA a breakup fee of $500,000 in the event that SIA were outbid or the debtor or the Committee terminated the Revised Contract.[2] A letter to that effect

---

1. The sale closed in mid-January at which time certain payments were made to secured creditors to stop the accrual of interest. The balance of the proceeds are being held in escrow for disbursement in accordance with the plan of reorganization which is ultimately confirmed.

2. Section 37.5 of the Revised Contract, which pertains to the breakup fee, provides in its entirety as follows: If Purchaser has obtained and delivered to the Bankruptcy Court, the Seller, and the Committee of Unsecured Creditors on or before November 25, 1988, a mortgage commitment, letter of credit or other *bona fide* evidence of the ability to fund the entire cash portion of the Purchase Price at the closing (provided that a letter from a recognized mortgage broker, investment banker or lending institution stating that it is "highly confident" that *the necessary financing can be raised on the security of the Premises shall be deemed bona fide* evidence of the ability to fund), and if

either (a) the Bankruptcy Court fails to approve the sale of the Premises to the Purchaser pursuant to this Contract because a higher or better offer for the purchase of the Premises has been obtained and approved by the Bankruptcy Court or (b) this Contract is terminated by either the Seller or the Committee of Unsecured Creditors pursuant to paragraph 37.1 hereof and at the time of such termination (i) the Purchaser shall not be in default hereunder, (ii) this Contract shall not have previously been terminated pursuant to the provisions of this Contract, and (iii) no event shall have occurred which with the giving of notice or passage of time would have resulted in Purchaser's default hereunder or given rise to a right of Seller to terminate other than pursuant to paragraph 37.1 hereof, then in addition to the refund of the Downpayment as herein provided, the Seller shall pay to the Purchaser or its designee, the sum of Five Hundred Thousand ($500,000) Dollars as reimbursement

from Coldwell Banker was provided on November 23, 1988 (the Financing Letter). At the auction sale, SIA represented that no part of the $500,000 breakup fee, if approved, would be paid to Mr. Guterman, his affiliates, his relatives or their affiliates.

The Revised Contract was an arms-length contract negotiated with the Committee with the participation of Centrust Services, Inc. (Centrust), a minority limited partner of the debtor. Whereas Centrust concurred in virtually all of the terms of the sale, it objected to payment of a breakup fee in general and in the amount of $500,000 in particular. At the auction, none of the creditors of the estate objected to the breakup fee. The Committee, in fact, vigorously supported payment of a breakup fee, subject to the provision of a letter indicating the wherewithal for SIA to have wire transferred $1,000,000 to the estate. The debtor and the first mortgagee also affirmatively supported the approval of the fee.

Centrust objects to the amount of the breakup fee because a portion of the out-of-pocket expenses are attributable to earlier agreements negotiated by the debtor and SIA, rather than to the Revised Contract which was the auction's underpinning. In order to undestand this objection, it is necessary to step back in time. The debtor and SIA had originally contemplated converting the hotel to cooperative ownership, a concept which was anathema to all the creditor constituencies, who wanted an outright sale of the hotel. With an eye toward furthering the planned cooperative conversion, the debtor first submitted to the court an application to approve (i) interim secured financing from SIA senior to all liens other than those of the first and second mortgagees and the Internal Revenue Service which financing would be used to pay

future rent, renovate the hotel to make it more suitable for conversion to a cooperative and pay certain expenses of and points to SIA on the loan; (ii) SIA's purchase of the hotel and (iii) a final secured loan whose proceeds were to be used to pay certain existing debt, future debt and expenses of SIA when it purchased the hotel pursuant to a plan to be proposed by the debtor which had to contain a variety of provisions including restructuring and extension of the mortgagees' debt and distributions in specified amounts to other classes of creditors. The debtor's ability to draw on the initial loan was to be conditioned upon its first filing the contemplated plan. The closing of the final loan was to be conditioned upon confirmation of the plan. In addition, the documents provided that under certain conditions SIA's legal fees would be borne by the debtor and, in addition, if the debtor failed to submit a plan incorporating the terms to which the debtor had agreed with SIA, SIA would be entitled to a fee of $440,000. Faced with overwhelming creditor opposition, the debtor amended the application.

The amended application substantially reduced the amount of the initial loan by eliminating the costs for the proposed renovation of the hotel, the expenses for which were tacked onto the final loan, thereby increasing the amount of that loan. Most of the conditions to the funding of the initial loan remained as originally proposed but instead of requiring the first mortgagee to consent to restructuring of its loans, the amended agreement allowed the debtor instead to seek to equitably subordinate or otherwise avoid the claim and lien of the first mortgagee. The amended agreement also allowed the debtor to elevate the second mortgagee to a first position, but provided that the second mortgagee had to

for costs and expenses in connection with negotiation of this Contract, the inspection of the Premises and arrangements for necessary financing seven (7) business days after the closing of its sale of the Premises unless such payment is stayed by the Bankruptcy Court, which payment shall be an administrative expense payable from the proceeds of such sale of the Premises and shall be a lien on the Premises or the proceeds, but in any event such claim shall be

an allowed administrative expense. The foregoing payment shall additionally be made to reimburse Purchaser for its lost opportunity and other damages sustained by reason of this Contract not being approved as a result of a higher or better offer being made for the Premises. The parties agree that said sum is a reasonable estimate of Purchaser's cost, expense and loss. The provisions of this Paragraph 37.5 shall survive any termination of this Contract.

agree to a restructuring of its loan. The legal expense provision and $440,000 break-up fee were retained. The reorganized debtor was to receive a 24.75% interest in the net sales proceeds of the hotel or portions thereof. In addition, the claims of an affiliate of Gerald Guterman's wife were to be recognized as valid and allowed claims. The hotel was still to be sold to SIA pursuant to a confirmed plan of reorganization whose terms were in large part spelled out by the agreement. In addition, the debtor sought in the amended application to extend its exclusive period to solicit acceptances to the plan which by then it had filed in accordance with the amended agreement with SIA.

Again, the creditors were inalterably opposed, both to the agreement with SIA and to the extension of the exclusive period. Reading the handwriting on the wall, the debtor consented to termination of the exclusive period, withdrew its request for financing and agreed with the first mortgagee that that mortgagee would provide interim financing on terms far more palatable to the creditors than SIA's.

Some six weeks later, the Committee filed a motion (the Responsible Person Motion) seeking authority to enter into or compel the debtor to enter into a proposed form of a contract for the outright sale of the hotel for a sum not less than $62,000,000. Significantly, this form of contract contained a breakup fee of $500,000, payable in the event that the purchaser were not successful solely because of court approval of a higher and better offer. The Committee's application in support of the motion to approve the form of contract stated that "[t]he Committee respectfully submits that the proposed 'break-up' fee is appropriate and, in view of the fact that such amount represents less than one percent (1%) of the purchase price, is reasonable in all respects." No purchaser had signed the contract; the form was meant to be a blueprint for a sale to a party eventually to be selected by the Committee.

The Committee thereafter filed a plan and a motion to appoint a trustee.

The debtor opposed the Responsible Person Motion and filed its own motion seeking to sell the hotel outright to SIA pursuant to the debtor's plan of reorganization. This contract dated October 12, 1988 contained a $500,000 breakup fee payable if a higher or better offer were approved by the court. The interested parties met with me in chambers where it was agreed that the Committee would collect comments respecting the SIA contract and work with the debtor to attempt to amend the objectionable provisions so as to consensually auction the hotel. This exercise bore fruit and led to the execution of the Revised Contract negotiated by the Committee pursuant to which Tobishima purchased the hotel. With the approval of the Committee but the disapproval of Centrust, the Revised Contract contained a $500,000 breakup fee, as had its predecessors.

Provision was made in the Revised Contract for a down payment of $1,000,000 payable upon bankruptcy court approval of the Revised Contract. Whereas it apparently had been contemplated that court approval would be sought before the auction began, the interested parties, including the Committee and Centrust, agreed to conduct the auction without first seeking that approval.[3] Accordingly, SIA was not required to and did not post the down payment prior to the auction. The other bidders, pursuant to the announced terms of sale, were required to and did deliver certified $1,000,000 checks to the debtor's counsel as the admission ticket for bidding.

As it transpired, SIA made no bids at the auction other than the initial one set forth in the Revised Contract. When after the bidding approval was sought of the Revised Contract with its breakup fee, the Committee's counsel stated: "As a condition to the payment of the break-up fee, we would require that Mr. Blumenthal [counsel for SIA] produce on behalf of his client documentation of the availability of [the

---

**3.** It was recognized that a sufficiently high sales price would eliminate the need for resolving certain of Centrust's objections to the sale. Indeed, the $76,000,000 price had that effect.

$1,000,000]." Transcript of November 29, 1988 at 157. SIA agreed to this demand.

By letter dated December 5, 1988 (the Down Payment Letter), Andrew N. Heine, a principal in SIA, advised that he "had available credit facilities through Kinney [Systems, Inc., of which he is chairman], to wire transfer at my sole discretion One Million Dollars which would have been required pursuant to Paragraph 56 of the Agreement by and between SIA ... and 995 Fifth Avenue Associates, L.P. ..." Subsequent to the submission to me by SIA of documentation respecting its out-of-pocket expenditures, the Committee, by letter dated January 19, 1989, objected to the payment of the breakup fee in its entirety because the Down Payment Letter did not state in language clear enough for the Committee's satisfaction that $1,000,000 had been available for wire transfer by SIA. Centrust concurs in this objection and questions, as well, whether particular services rendered would have been compensable from the estate had SIA's professionals been appointed by this court so that their services would have been subject to my scrutiny.

In the corporate takeover context it is recognized that breakup fees are not illegal where they enhance rather than hamper the bidding. *CRTF Corp. v. Federated Department Stores, Inc.*, 683 F.Supp. 422, 440 (S.D.N.Y.1988). Breakup fees and other strategies may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *Samjens Partners I v. Burlington Industries, Inc.*, 663 F.Supp. 614, 624 (S.D.N.Y. 1987). When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, breakup fees are generally permissible. *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 578 (11th Cir. 1988). But if such a fee is too large, it may chill the bidding to the detriment of shareholders (or, if the company for sale is insolvent, its creditors). In such instances, the fee is not protected by the business judgment rule (which bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes) and is thus subject to court review. *See Samjens*, 663 F.Supp. at 624–25. In the takeover arena, when it becomes clear that a company is for sale, the board of directors is under a further duty, when conducting the auction, to deal fairly with the bidders. *Id.* at 624. These principles have vitality by analogy in the chapter 11 context.[4]

Although Mr. Guterman certainly stood to gain from a sale to SIA, he was not to share in the breakup fee. Moreover, there were safeguards here not available in the merger or takeover scenario, specifically, scrutiny by the creditors, negotiation by the Committee of the Revised Contract and a judicial auction. This breakup fee was not one arbitrarily selected or acquiesced in by the debtor for the purpose of enriching Mr. Guterman. Significantly, even the Committee's form contract contained a virtually identical fee in the same amount notwithstanding that the bulk of the expenses incurred in negotiating that contract would probably not have been borne by the contract vendee. It cannot be said that the Revised Contract's breakup fee prohibited or chilled the bidding; there was an active auction on the Revised Contract which yielded a cash sale well above the levels discussed by potential offerors prior to the execution of the Revised Contract.[5] The price garnered should be sufficient to pay all creditors in full, with interest, or, at a minimum, pay the secured creditors in full, with interest, and pay the unsecured creditors substantially in full. The amount

---

4. Admittedly, this debtor is not a corporation. But given its bankruptcy, the debtor in possession is undeniably cast in the role of a fiduciary vis-a-vis its creditors. Thus, the same type of analysis utilized to protect corporate shareholders should be employed to protect the partnership creditors.

5. See paragraph 9 of the Committee's application in support of the Responsible Person Motion which names two prospective purchasers who were believed to have been willing to enter into the Committee's proposed form of contract to purchase the hotel for a minimum of $62,-000,000.

of the breakup fee is not unreasonable in relation to the size of the sale, the work and expense involved in negotiating the October 12 contract and the Revised Contract and the cost of obtaining the Financing Letter.[6] Mr. Guterman has not been shown to have engaged in self-dealing, fraud or bad faith in entering into the Revised Contract. Nor is any claim made that the auction was somehow tainted by unfair dealing. Accordingly, there is no reason to disapprove the amount of the fee set in the Revised Contract.

The only remaining consideration is the Committee's unhappiness with the phraseology of the Down Payment Letter. Whereas I appreciate the concern which prompted the request for assurances, the contractual provision relating to proof of ability to finance the transaction was fully complied with when SIA delivered the Financing Letter. Had the Committee any reservation about SIA's ability to post a down payment, it should have required a deposit prior to court approval of the Revised Contract. At the very least, had there been legitimate cause for concern, the Committee or Centrust could have pressed for approval of the Revised Contract in advance of the bidding. But since the Committee and Centrust, the latter through its acquiescence in the auction prior to approval of the Revised Contract, chose to allow SIA not to make a down payment, I would be remiss in denying the fee solely because of an unsubstantiated fear that SIA may not have had the ability to post the $1,000,000. Any argument that SIA bore no risk and should not receive its fee because it did not make the down payment is misplaced inasmuch as SIA incurred very substantial expenses to arrive at the point where bids were made upon the Revised Contract. In any event, the Down Payment Letter adequately complies with the request that SIA instruct the interested parties of its ability to wire transfer the $1,000,000, even though Mr. Heine

did not explain how Kinney Systems, Inc. came to authorize him to effect the transfer.

For the reasons set forth above, a breakup fee in the contractual amount of $500,000 will be approved. Settle order consistent with this opinion.

---

6. The court rejects out of hand the notion advanced by Centrust that the breakup fee should be limited to the amounts actually expended by SIA in connection with the October 12 contract and the Revised Contract. Although I requested documentation to satisfy myself about the efforts undertaken by SIA, I recognize that the breakup fee is a negotiated figure designed to compensate the purchaser for more than simply his documented expenses.