**In re HUPP INDUSTRIES, INC., Debtor.**

**Bankruptcy No. B91–16229.**

United States Bankruptcy Court,
N.D. Ohio, E.D.

May 7, 1992.

Salvatore A. Barbatano, Rudnick & Wolfe, Chicago, Ill., Michael Schenker, Kelley, McCann & Livingstone, Cleveland, Ohio, for debtor.

William E. Schonberg, David Coffey, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for Committee of Unsecured Creditors.

James M. Lawniczak, Calfee, Hatler & Griswold, Cleveland, Ohio, for State Bank of South Australia.

Lawrence E. Oscar, Hahn Loeser & Parks, Cleveland, Ohio, for Dreison Int'l., Inc.

Arthur J. Tassi, Osborne Mills, Jr., Cleveland, Ohio, for Huntington Nat. Bank.

Lenore Kleinman, Office of the U.S. Trustee, Cleveland, Ohio, for U.S. trustee.

## MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

Hupp Industries, Inc., the Debtor and Debtor-in-possession (the Debtor), caused to be filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 12, 1991. A former automotive manufacturer, the Debtor presently manufactures various industrial and commercial products through its several divisions. Two of those divisions, DCM and the Mobile Products divisions, are the subject of a proposed sale to Dreison International, Inc. (Dreison). The matter presently before the Court is the Debtor's motion for authority to enter into a letter of intent

("the Letter") to further effectuate the sale of the two divisions to Dreison. Upon a duly noticed hearing, objections to the motion were filed by the Official Creditors Committee (Creditors Committee) and by the State Bank of South Australia (SBSA), a principal secured creditor.

As structured, the Letter contains several provisions agreed upon between the Debtor and Dreison and, in pertinent part, reflects the following:

a) The Letter requires the Debtor to seek prompt approval of the Letter;

b) Requires both parties to prepare and execute a definitive asset purchase agreement once Dreison completes its due diligence;

c) Obligates the Debtor to pay a break-up fee of $100,000.00, plus out-of-pocket expenses not to exceed $50,000.00, relative to a proposed purchase price of $4,750,000.00, subject to adjustment, for the two divisions. Additionally, Dreison is required to escrow an amount of $75,000.00 following the conclusion of Dreison's due diligence period, pursuant to certain provisions.

d) Obligates the establishing of a bid increment limitation of $300,000.00 (bid protection provision)

e) Requires Dreison to escrow a 'non-refundable' $50,000.00 earnest money deposit, pursuant to certain terms;

In other respects, the Letter reflects that the subject asset sales will be made outside the ordinary course of the Debtor's business pursuant to § 363(b) and (f) of the Bankruptcy Code [11 U.S.C. 363(b) and (f)] or, alternatively, through an adjudicated plan of reorganization. The Letter reflects that the parties acknowledge that the final purchase agreement must be approved by the Court before it will bind the Debtor.

The objections of the Creditors Committee and of SBSA have been considered in view of the above-referenced provisions of the Letter. The Creditors Committee's objection is rather comprehensive in scope but specifically includes objections to the allowance of a break-up fee and a bid increment limitation provision, as proposed. The Committee further objects on the grounds that a) the motion fails to include a detailed listing of the subject assets; b) insufficient information is available presently to evaluate the merits of the proposed sale; c) the requested break-up fee (i.e., "Buyer Protection Fee") is excessive; d) the minimum, upset bid increment of $300,000.00 bears no apparent relation to the purchase price, provides a "chilling effect," and is in derogation of the principal purpose of maximizing a value that would be beneficial to the Debtor's estate.

SBSA objects to an approval of the Letter. SBSA's concern is principally focused on the proposed break-up fee of $100,-000.00 which, as it understands a) must be paid based upon events uncontrollable by the Debtor; b) objects to the allowance of such a fee as the proposed terms relating to the fee are unduly broad and, as such, fail to enhance the bidding process, rather than enhance it; c) the fee should only be allowed if the assets are sold to a higher bidder or if the Debtor withdraws from the sale; d) payment of the break-up fee prior to the entry of a court order permitting the sale is inappropriate; and finally, e) any out-of-pocket expenses incurred under the $50,000.00 limit, should be further limited to such expenses incurred following the approval of the Letter. In another sense, SBSA objects to an approval of the Letter as it contains a provision which, if approved, would allow Dreison to withdraw from the sale transaction at any time prior to a closing, even once a court order has entered confirming the sale.

The principal issue the Court must decide in resolving this matter is whether the proposed Letter, as a major preconfirmation transaction, subserves the underlying purpose of Chapter 11, or will its approval subvert that process.

*Break-up Fee, Generally*

As defined by one Court:

A "break-up fee" is a fee paid to a potential acquirer of a business or certain assets by the seller, in the event that the transaction contemplated fails to be consummated and certain criteria in the purchase agreement are met.

*In re Integrated Resources, Inc.,* 135 B.R. 746 (Bankr.S.D.N.Y.1992).

Others have defined break-up fees as being concessions extracted by aggressive friendly bidders.[1] Included among the concessions would be an agreement to make a certain payment (i.e., "break-up fee") to the unsuccessful negotiating acquirer in the event the acquisition fails by reason of an upset bid. Such fees have been allowed by some courts where the amount in question was not so high as to cause a chilling effect upon other potential bidders. Except in extremely large transactions, break-up fees ranging from one to two percent of the purchase price have been authorized by some courts.[2]

■ Significant factors to be considered in determining the propriety of allowing break-up fee provisions include, *inter alia,* the following:

1) Whether the fee requested correlates with a maximization of value to the debtor's estate;

2) Whether the underlying negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;

3) Whether the principal secured creditors and the official creditors committee are supportive of the concession;

4) Whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;

5) Whether the dollar amount of the break-up fee is so substantial that it provides a "chilling effect" on other potential bidders;

6) The existence of available safeguards beneficial to the debtor's estate;

7) Whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

■ It is observed that some courts have considered the allowance of break-up fees in various forms. One court considered such fees framed solely in the form of expense reimbursement for out-of-pocket expenses relating to costs incurred during a due diligence period, while another court allowed reasonable break-up fees wholly independent of the transaction costs. *See, In re Integrated Resources, supra,* at 752–53; *In re 995 Fifth Ave. Assocs., supra,* at 29, n. 6. A rationale advanced for the allowance of break-up fees posits that, without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's (i.e., "stalking horse's") due diligence. *Integrated Resources, supra,* at 750. On the other hand, a potential harm which follows an imprudent allowance of a break-up fee results in a lesser spirited auction process and may preclude further bidding in instances where the fee is so large that it makes competitive bidding too costly. In the context of a nonbankruptcy asset sale, the propriety of break-up fees are presumptively appropriate in view of the business judgment rule and, thusly, seldom require judicial attention. *Id.* In the bankruptcy context, however, the Court must be necessarily wary of any potential detrimental effect that an allowance of such a fee would visit upon the debtor's estate.

In one sense, the objection of the Creditors Committee is premature. Where it contends that it presently has insufficient information upon which to evaluate the merits of the proposed sale, that factor is not prejudicial to the Committee at this juncture, as the sole matter before the Court is a motion to authorize the Debtor to execute the Letter with a proposed purchaser. Any sale to be effectuated between the parties, as presented, will occur pursuant to provisions of § 363(b) and (f)

---

**1.** "Negotiated Acquisitions: The Impact of Competition in the U.S.," by Leo Herzel and Richard W. Shepro, *The Business Lawyer,* Vol. 44, No. 2 (February, 1989).

**2.** *Cottle v. Storer Communication,* 849 F.2d 570, 578–79 (11th Cir.1988); *CRTF Corp. v. Federated*

*Dept. Stores,* 683 F.Supp. 422, 440 (S.D.N.Y. 1988); *Samjens Partners I v. Burlington Industries, Inc.,* 663 F.Supp. 614, 624–25 (S.D.N.Y. 1987); *In re 995 Fifth Avenue Assoc., L.P.,* 96 B.R. 24 (Bankr.S.D.N.Y.1989).

of the Code or through an adjudicated plan of reorganization. In either instance, the Creditors Committee would be afforded ample opportunity to file a timely objection to a motion to confirm a sale of assets. Additionally, if the asset sale is incorporated as a plan provision within a proposed plan of reorganization, again, the Committee is not without recourse to vote rejection of the plan and/or file an objection, if either is warranted.

 As proposed, Dreison would receive a break-up fee of $100,000.00. That $100,000.00 is to be paid independent of any transactional costs to be incurred by Dreison during the due diligence period, for which Dreison seeks a cap of $50,000.00. Break-up fees, as a bidding incentive, are commonly found in nonbankruptcy corporate combination transactions. In bankruptcy pre-plan confirmation sales of assets, however, an allowance of such fees is to be highly scrutinized in view of the uncertainty of dividends, if any, to be received by claimants of the debtor's estate. This concern is of particular relevance as it applies to the fate of unsecured claimants. Break-up fees, where appropriate, should only be authorized where the fee is to compensate an unsuccessful acquirer which served as the so-called "stalking horse." It is undisputed that this proposal is a result of an arms length negotiated agreement between the Debtor and Dreison. Dreison, according to the Debtor's schedules, is not a prepetition creditor of the Debtor's estate. When viewed in light of the subject purchase price, the amount of the break-up fee, if appropriate, conceivably constitutes a fair and reasonable percentage of the proposed purchase price. None of the principal secured creditors have expressed an opinion in opposition to the proposed sale. The Creditors Committee at this juncture, only expresses opposition to the allowance of a break-up fee as described above and to the extent that it has insufficient information upon which to evaluate the merits of the proposed sale. It further acknowledges, however, that 1) it anticipates receiving from the Debtor certain requested financial data; 2) it is willing to continue to work with the Debtor and the Debtor's financial advisors during the prospective purchaser's due diligence period to identify and collect the needed financial data; and 3) finally, it has reserved its right to object to any subsequent motion to authorize the sale of the subject assets or to challenge the sufficiency of a plan and disclosure statement provision relative to a disposition of these assets. Thusly, the Committee is not without safeguards.

Additionally, sufficient safeguards are in place to ameliorate any detriment to the Debtor's estate in the event the negotiated transaction to be performed through the Letter becomes ill-fated: 1) Dreison is obligated to escrow a $50,000.00 non-refundable earnest money deposit, in addition to the escrowing of another deposit of $75,000.00 which is refundable only upon the occurrence of certain conditions.

 The proposed asset bid increment limitation in the amount of $300,000.00, however, is arbitrary and unreasonably high and otherwise has not been justified. (Letter of Intent, para. 11). Further, the Letter provision entitling Dreison to injunctive relief relative to the upset bid limitation is procedurally improper and is otherwise not well-founded. (*Id.*, at para. 10).

 The real harm to be perpetuated upon the Debtor's estate in this case by the break-up fee is found not in the amount of the fee but, rather, in the provision that allows Dreison to receive the $100,000.00 fee regardless of the outcome of the proposed sale. As described above, an unsuccessful stalking horse should be entitled to a reasonable break-up fee, where appropriate, but no fee is earned or should be allowed where the negotiated bidder ultimately is the successful purchaser of the assets. Outside the bankruptcy context, courts generally defer to an application of the business judgment rule which "bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. Sup.1985). In the bankruptcy context,

however, bidding incentives such as break-up fees and bid increment limitations are carefully scrutinized in § 363(b) asset sales to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected.[3] In the present case, as provided in the letter of intent, the fee, as proposed, would only be an unwarranted expense upon the Debtor's estate.

In another sense, the requested break-up fee of $100,000.00 is unjustified. The motion requests that the fee be allowed as an administrative expense of the Debtor's estate. Administrative expense claims are addressed under § 503 of the Bankruptcy Code. Therein, § 503(b) allows the payment of administrative expense claims under six specified instances. The $100,000.00 break-up fee sought by Dreison is not sufficiently described to allow it to be paid under any provision of § 503. In fact, the $100,000.00 figure is not characterized, for any purpose other than unspecified "liquidated damages."

Under § 503(b) administrative expense claims are allowed where 1) they relate to the actual, necessary costs and expenses of preserving the debtor's estate; 2) they are for compensation and expense reimbursement addressed under § 330; 3) they are allowed where they represent actual, necessary expenses, other than compensation and reimbursement in paragraph (4); 4) they are allowed for reasonable compensation for professional services, rendered by an attorney or an accountant; 5) they are allowed for reasonable compensation for services rendered by an indenture trustee; and 6) they represent fees and mileage payable under 28 U.S.C. 119. Clearly, no administrative expense is allowed under § 503 for an allowance unrelated to an actual expense incurred. The $100,000.00 break-up fee, as intended by the parties is characterized blithely as "liquidated damages" (Letter of Intent, para. No. 10). Section 503(b) of the Code, however, only allows payment of administrative expense claims which are for "actual"

expenses incurred that were also beneficial to a debtor's estate. Further, the literal language of § 503(b)(3) and its legislative history require a "creditor" as the applicant for an administrative expense allowance. See, H.Rep. No. 95–595, to accompany H.R. 8200, 95th Cong., 1st Sess. (1977) p. 355. As indicated above, Dreison is not a creditor of the Debtor's estate and, otherwise, its assertion of unforeseen and unspecified liquidated damages (Letter of Intent, para. 10) is insufficient to establish that Dreison has conferred a substantial benefit to the Debtor's estate to warrant an administrative expense allowance. See, In re The Frog and Peach, Ltd., 38 B.R. 307 (Bankr.N.D.Ga.1984). As unspecified liquidated damages, the subject break-up fee fails to meet this standard of § 503. A break-up fee should not be authorized as an administrative expense where it is ill-defined, not correlated to an actual transactional cost or expense incurred by the negotiating bidder, and otherwise cannot be addressed under a specific provision of § 503(b).

The Debtor argues that an expeditious approval of the instant motion is essential as it constitutes the center-piece of the Debtor's proposed plan of reorganization and a failure to expedite the approval will result in a deterioration of the value of the subject assets. That argument was advanced in a similar case heard by the Second Circuit which enunciated the "business justification" test for the approval of pre-confirmation sales under § 363(b). In re Lionel Corp., 722 F.2d 1063 (2d Cir.1983). That particular test requires the court to make an express finding from the evidence of a sound business reason before the pre-confirmation sale can be approved. Although the instant matter does not require a present ruling to authorize or confirm a sale, the court in Lionel rejected the view that a preconfirmation sale of a substantial asset is permitted only in an emergency or where the asset is deteriorating in value. It further held, on the other hand, that § 363(b) does not give the Bankruptcy

---

3. See, "Using Bidding Incentives In Bankruptcy Asset Sales," Berman, Howard J., N.Y.L.J. (May 9, 1991); In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr.S.D.N.Y.1990).

Court unbridled authority to approve a pre-confirmation sale outside the safeguards embodied in Chapter 11. *Id.* at 1069–71. *See also, In re Hunt Energy,* 48 B.R. 472, 485 (Bankr.N.D.Ohio 1985). Both concerns have been considered in reaching a resolution of the Debtor's motion. As such, the $100,000.00 would not be entitled for payment as an administrative expense.

For these reasons, the Debtor's motion seeking authority to enter into the letter of intent to sell assets outside the ordinary course of business is hereby denied. Should the Debtors and Dreison be willing to renegotiate their agreement to conform with the deficiencies noted herein, the matter will be reconsidered upon application.

Accordingly, the objections of the Creditors Committee and of SBSA are hereby sustained, in part, and overruled in part.

IT IS SO ORDERED.