**In re TWENVER, INC., d/b/a KTVD Channel 20, Debtor.**

**Bankruptcy No. 90–11846 DEC.**

United States Bankruptcy Court, D. Colorado.

Dec. 29, 1992.

See also, 149 B.R. 950.

Thomas C. Bell, Davis, Graham & Stubbs, Denver, CO, for debtor.

David T. Brennan, Otten, Johnson, Robinson, Neff, & Ragonetti, P.C., Denver, CO, for Chrysler Capital Corp.

Thomas C. Seawell, Dewey, Dewey & Seawell, P.C., Denver, CO, for MCA Television Ltd. and Twentieth Century Fox Film Corp.

Carolyn C. Fuller, Fairield and Woods, P.C., Denver, CO, for Unsecured Creditors Committee.

Paul D. Rubner, Rubner & Kutner, Denver, CO, for Terence Brown.

ORDER DENYING PLAN PROPO-
NENTS' MOTION FOR APPROVAL
OF TOPPING FEE

DONALD E. CORDOVA, Bankruptcy
Judge.

THIS MATTER came on for hearing on
December 15, 1992, on the Plan Propo-
nents' Motion for Approval of Topping Fee,
filed on October 15, 1992, and the response
thereto filed by secured creditor Chrysler
Capital Corporation. The Court has consid-
ered the Motion and the arguments pre-
sented by the parties and finds that the
Motion should be denied.

The Motion seeks approval for a $50,-
000.00 "topping fee" (also known as a
"breakup fee") in the event that the Debt-
or's television station is eventually sold to
another entity for at least $100,000.00 more
than offered by the current proposed pur-
chaser, Terence J. Brown, d/b/a/ Denver
Broadcast Company.

According to the Motion, the fee would
be paid out of the proceeds of the sale, and
not by the bankruptcy estate. Mr. Brown
has proposed paying $450,000.00 for 90% of
the shares in the reorganized Debtor, with
the remaining 10% of such stock to be
issued to unsecured creditors. In the Mo-
tion, the Plan Proponents state that Mr.
Brown has expended substantial sums of
money for due diligence and attorneys fees
which would be lost if the Plan were with-
drawn. They contend that the $50,000.00
"topping fee" serves to compensate Mr.
Brown for his time and expense and for the
risk of taking the lead in evaluating the
Debtor's prospects. At the hearing, coun-
sel for the Plan Proponents asserted that
the fee sought was similar to a "topping
fee" proposed to be paid to Pennsylvania
Bancshares in an earlier potential sale in
this case, and approved by this Court's
Order of April 9, 1992.

Chrysler Capital Corporation argues that
the other proposed purchases which have
been attempted during the course of the
bankruptcy preclude Mr. Brown from char-
acterizing his actions as those of a "stalk-
ing horse", that is, as initiating a bidding
period. Chrysler alleges that Mr. Brown's
proposal represents a "last-ditch" effort to
salvage the Debtor's operations, and points
out that no mention of a "topping fee" was
made during the original presentation to
the Court of Mr. Brown's proposal at the
October 6, 1992 hearing.

Judge Kane, in granting a motion to dis-
miss an appeal from this Court's Order
approving the "topping fee" to be paid in
connection with the Pennsylvania Banc-
shares proposal, found that the order was
not a final order for appeal purposes, and
stated that whether such a fee was justi-
fied is a question of fact depending upon
the circumstances at issue. *In re Twenver,
Inc.*, 127 B.R. 467, 470 (D.Colo.1991). Colo-
rado Courts have not had occasion to con-
sider the matter of "topping fees" or
"breakup fees" in detail.

In *In re Integrated Resources, Inc.*, 135
B.R. 746, 750 (Bankr.S.D.N.Y.1992), Judge
Blackshear explained that a "breakup fee"
or "topping fee" is a fee paid to the poten-
tial purchaser of business assets when the
transaction is not consummated, most com-
monly when the seller accepts a later bid.
Such fees may encourage a potential pur-
chaser to make an initial bid, which may
then be used to attract higher offers. *Id.*
The Court noted that in nonbankruptcy
cases, courts generally recognize that such
fees are common in corporate transactions,
and rarely rule on their propriety because
they are presumptively proper under the
business judgment rule. *Id.* However,
with regard to such fees in connection with
the sale of assets of a bankruptcy estate,
the Court made the following observations:

> A breakup fee may discourage an auc-
> tion process and preclude further bidding
> when the fee is so large as to make
> competitive bids too expensive. *See,
> Revlon Inc. v. MacAndrews & Forbes
> Holdings, Inc.*, 506 A.2d 173 (Del.Sup.
> 1985). (footnote omitted) Thus, when the
> fee is so large that it chills the bidding
> process, it will not be protected by the
> business judgment rule.

> When a sale of the debtor's assets
> outside the ordinary course of business is
> proposed, courts will carefully scrutinize
> the use of break-up fees. This is be-
> cause bidding incentives impose expenses

on the debtor's estate and do not merely affect shareholders as in the corporate control cases, but affect the debtor. creditors and equity holders, alike. *Id.*, at 135 B.R. 750–751. The Court approved a "breakup fee" of approximately 1% of the proposed purchase price.

The United States District Court for the Southern District of New York recently affirmed the *In re Integrated Resources, Inc.* decision. *In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y.1992). The District Court reviewed bankruptcy and non-bankruptcy decisions regarding "topping fees" or "breakup fees" and concluded that they suggest three questions for courts to consider in evaluating such fees: (1) whether the relationship of the parties who negotiated the fee is marked by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and, (3) whether the amount of the fee is reasonable in relation to the proposed purchase price. *Id.* at 657

In another case cited by both the Plan Proponents and Chrysler Capital Corporation, the Bankruptcy Court for the Northern District of Ohio identified the following considerations concerning the propriety of "breakup fees":

1) Whether the fee requested correlates with a maximization of value to the debtor's estate;

2) Whether the underlying negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;

3) Whether the principal secured creditors and the official creditors committee are supportive of the concession;

4) Whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;

5) Whether the dollar amount of the break-up fee is so substantial that it provides a "chilling effect" on other potential bidders;

6) The existence of available safeguards beneficial to the debtor's estate;

7) Whether there exists a substantial adverse impact upon unsecured creditors, where such creditors are in opposition to the break-up fee.

*In re Hupp Industries, Inc.*, 140 B.R. 191, 194 (Bankr.N.D. Ohio 1992). The Court in that case disallowed a "breakup fee" of $100,000.00 in relation to a $4,750,000.00 purchase price, where, even though the proposed fee constituted a reasonable percentage of the purchase price, the purchaser was to be awarded the fee regardless of the outcome of the proposed sale. *Id.*, at 140 B.R. 195. Describing the difference in the approach to such fees in bankruptcy and nonbankruptcy cases, the Court stated, "[i]n the bankruptcy context, however, bidding incentives such as break-up fees and bid increment limitations are carefully scrutinized in § 363(b) asset sales to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *Id.* at 140 B.R. 195–196.

It appears to the Court that these cases, as well as others, *See, In re Financial News Network*, 126 B.R. 152 (S.D.N.Y. 1991); *In re 995 Fifth Avenue Associates, L.P.*, 96 B.R. 24 (Bankr.S.D.N.Y.1989), focus upon the three factors enumerated by the Federal District Court for the Southern District of New York in *In re Integrated Resources, Inc.*, and the Court will adopt that framework.

In the instant case, Chrysler Capital Corporation has suggested that the proposed plan seeks to further the interest of the carriers, rather than the debtor and its creditors, but has submitted no evidence to support that assertion. However, the proposed $50,000.00 "topping fee" exceeds 10% of the proposed purchase price of $450,000.00, and the Plan Proponents request that this Court order that any competing bids must be at least $100,000.00 higher than the current bid. Given the obstacles which must be overcome for the Debtor to reorganize successfully, and the dollar amounts involved, the Court believes that this arrangement would serve to hamper, rather than enhance, any prospects for a higher bid. A potential bidder who is in a position to offer the Debtor an additional $25,000.00 or $50,000.00 for the benefit of

the creditors might well find himself "over his head" at the prospect of having to pay an additional $100,000.00 even to enter the bidding. In addition, the Court finds that the 10% "topping fee" sought here greatly exceeds the 1% to 2% fees found to be reasonable in the majority of cases approving such fees. *See, e.g., Cottle v. Storer Communication,* 849 F.2d 570, 578–579 (11th Cir.1988); *In re Crowthers McCall Pattern, Inc.,* 114 B.R. 877, 879 (Bankr. S.D.N.Y.1990); *In re 995 Fifth Avenue Associates, L.P., supra,* at 96 B.R. 28. For these reasons, the Court finds that the proposed "topping fee" is not in the best interests of the estate. Accordingly, it is

ORDERED that the Plan Proponents' Motion for Approval of Topping Fee is hereby DENIED.