**In re S.N.A. NUT COMPANY, an Illinois corporation, Debtor.**

**Bankruptcy No. 94 B 05993.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Aug. 31, 1995.

Ronald R. Peterson, Jenner & Block, Chicago, IL, for debtor.

Virginia W. Powell, Hunton & Williams, Atlanta, GA, for movant.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on the Application of Alimenta (U.S.A.), Inc. ("Alimenta") For Reimbursement of Costs and Expenses Incurred in Unsuccessful Bidding ("Application"). Alimenta seeks to recover $206,544.21 in costs and expenses arising out of its unsuccessful bid for the assets of S.N.A. Nut Company ("SNA" or "Debtor"). In support of its Application, Alimenta relies on the July 6, 1994 order ("Order") in which this Court stated that in the event Alimenta "is not the successful bidder, the Court may

allow reimbursement of Alimenta's out-of-pocket costs and expenses not to exceed $350,000 ("Costs and Expenses")." As an alternative basis, Alimenta seeks recovery as an administrative expense claim under 11 U.S.C. § 503(b). In response, the Debtor argues that Alimenta has no contractual right to reimbursement and, in the alternative, cannot meet its burden of proof for allowance of an administrative expense claim under § 503(b). Having considered the arguments, pleadings and exhibits, the Court finds that Alimenta is not entitled to reimbursement of its costs and expenses.

## BACKGROUND

SNA filed a voluntary petition for relief under Chapter 11 on March 25, 1994. Subsequently, SNA and Alimenta entered into negotiations for the sale of all of Debtor's assets. SNA received a written offer from Alimenta to purchase substantially all of its assets, free and clear of all liens, claims and encumbrances, for $28.8 million. On June 27, 1994, the Debtor filed a Motion for Leave to Sell Assets and To Set Sale Procedures ("Sale Motion"). That Motion referred to the Alimenta offer which included the provision requiring that it be paid a "breakup fee." The Creditors' Committee took the position that it did not object to a sale for an adequate price but was not endorsing the sale at the price, or under the terms, offered. The Court ordered that an auction sale be held without prejudging the question of whether Alimenta would be entitled to a breakup fee.

On July 6, 1994, an order was entered setting forth the procedures for the sale, which provided that in the event Alimenta was not the successful bidder it may apply for reimbursement which the Court may allow, in its discretion. Attached to the Order was a "Notice of Hearing on Debtor's Motion to Sell Assets" ("Notice").[1]

Paragraph 5 of the Notice set forth two alternative possibilities for recovery by Alimenta. The first was reimbursement to Alimenta of its out-of-pocket costs and expenses

---

1. The Court noted at the hearing on July 6 that the drafters of the Notice had erred in its use of the term "will allow" in lieu of "may allow" regarding the breakup fee. Alimenta agreed that the word should be "may".

not to exceed $350,000 if it was outbid at the sale. The second alternative applied if this Court did not authorize Debtor to sell its assets. In that instance, the Notice provided that the Court may consider whether reimbursement would be appropriate as an administrative expense.

Although at least two other bids were filed with the Court, none of the bids received, including Alimenta's, were adequate. Neither the Debtor nor the Creditors' Committee recommended Alimenta's bid. No sale occurred, and Debtor withdrew its Sale Motion. The Debtor eventually liquidated various of its assets via a liquidating plan. Alimenta now applies for reimbursement of its costs and expenses.

## JURISDICTION

This Court's jurisdiction derives from 28 U.S.C. § 1334 and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(e)(2)(A).

## DISCUSSION

Alimenta argues that the "breakup fee" was intended to apply even if no sale was consummated. It is clear from the Notice, however, that the parties contemplated both scenarios. The Court finds that the intent and agreement were that if Alimenta was outbid it was entitled to apply for a breakup fee, but if no sale was approved Alimenta could attempt to qualify itself under 11 U.S.C. § 503(b) as an administrative expense claimant.

*Breakup Fee:*

■ "A break-up fee, or more appropriately a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction." *In re Integrated Resources, Inc.,* 147 B.R. 650, 653 (S.D.N.Y.1992), *app. dismissed on jurisdictional grounds,* 3 F.3d 49 (2nd Cir.1993). "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." *In re Marrose Corp.,* 1992 WL 33848, *5 (Bankr. S.D.N.Y.1992). *See* Bruce A. Markell, *The Case Against Breakup Fees in Bankruptcy,* 66 Am.Bankr.L.J. 349, 352 (1992) ("Breakup fees are post-sale payments made to bidders who fail to acquire the target sought.")

*Non–Bankruptcy Treatment of Breakup Fees:*

Outside of bankruptcy, the courts have dealt with the concept of breakup fees and other bidding incentives in merger and acquisition cases.[2] Because the acquirer is taking the risk that "another party will come in and outbid you and all that time and money will have been spent for naught," *Beebe v. Pacific Realty Trust,* 578 F.Supp. 1128, 1150 n. 7 (D.Or.1984) (quoting *A Leveraged Buyout: What It Takes,* Business Week, July 18, 1983, at 194, 198), breakup fees are often part of the deal. "[A] potential acquirer's task is not finished when it signs its deal with manage-

---

2. These cases generally come to court when a shareholder of one party to a deal is dissatisfied. They are really not similar to the bankruptcy cases since most involve allegations of breach of fiduciary duty by the directors. The Board Of Directors favors one bidder due to the Board's self interest. The Board grants a favorable penalty clause to the favored bidder as a bar to competing bids. In *Cottle v. Storer Communication, Inc.,* 849 F.2d 570 (11th Cir.1988), for example, after a dissident stockholders' group announced it wanted to implement a liquidation and distribution of the assets of Storer Communication, Inc., ("Storer") the Storer board of directors solicited potential purchasers. Kohlberg, Kravis, Roberts & Company ("KKR") eventually acquired Storer after a bidding contest with Comcast Corporation; the Storer board of directors had granted KKR a lock-up option.

The plaintiff shareholder in *Cottle* alleged that the Storer directors had abused their discretion when the lock-up option was granted. *Samjens Partners I v. Burlington Industries, Inc.,* 663 F.Supp. 614 (S.D.N.Y.1987) involved another dissatisfied shareholder, who was also making a hostile tender offer. Samjens Partners I ("Samjens") commenced a tender offer for Burlington Industries, Inc. ("Burlington"). Burlington subsequently entered a merger agreement with Morgan Stanley Group, Inc. ("Morgan"), which included a $25 million break-up fee and up to $25 million as reimbursement for expenses. This agreement was approved by Burlington's board of directors. Samjens filed a cause of action which alleged, *inter alia,* that Burlington's board breached its fiduciary duty to Samjens, a Burlington shareholder, by agreeing to pay the break-up fee to Morgan.

ment: it could lose to a better bid if shareholders fail to approve its bid. The breakup fee is designed in part to compensate for the risk of losing a signed deal." Markell, *Case Against Breakup Fees,* at 353.

■ Generally, breakup fees are allowed as long as they "enhance" the bidding, *CRTF,* 683 F.Supp. at 440; *Samjens,* 663 F.Supp. at 624–625; Joseph Samet & Donald J. Kravet, *"Use of Break-up and Topping Fees in Asset Sales,"* Basics of Bankruptcy and Reorganization, 1993, and are reasonable in relation to the bidder's efforts and the size of the transaction, *Cottle,* 849 F.2d at 578. As long as procedural safeguards accompanied the approval of the bidding incentive by the board of directors, those bidding incentives will not be disturbed by the courts.

■ Agreements made by parties to a corporate combination are deferentially reviewed by non-bankruptcy courts under the business judgment rule. *Cottle,* 849 F.2d at 578; *CRTF Corp. v. Federated Dept. Stores, Inc.,* 683 F.Supp. 422 (S.D.N.Y.1988). Under the business judgment rule, there "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del.1985). Nonbankruptcy courts inquire into the procedures followed by the board of directors. If the process was fair, then the courts do not inquire into the substance of the transaction. The courts have, essentially, limited their review to a due process type of inquiry. The board of directors is in the business of running the corporation. If the procedures utilized by the directors are applied fairly, and if the directors do not violate any of their fiduciary duties, then, under the business judgement rule their decision will not be second-guessed.[3]

By contrast, when a bankruptcy court is reviewing proposed actions under § 363(b), those actions are necessarily outside of the ordinary course of business.[4]

*Bankruptcy Treatment of Breakup Fees:*

Some bankruptcy cases have followed the lead of nonbankruptcy courts and applied the business judgment rule to the use of bidding incentives in bankruptcy asset sales. In *Integrated Resources,* 147 B.R. 650, at 657 the Court looked for key factors, including the time and resources invested by the acquirer, the complexity of the transaction, and whether other bidders were attracted, but excluding the presence of an agreement which was binding on the parties pending court approval. In that case there were multiple bidders for the assets. In *In re Crowthers McCall Pattern, Inc.,* 114 B.R. 877, 888 (Bankr. S.D.N.Y.1990), a break-up fee was approved without discussion. The Court in *In re 995 Fifth Avenue Associates, L.P.,* 96 B.R. 24, 28 (Bankr.S.D.N.Y.1989), held that principles used outside bankruptcy to evaluate bidding incentives "have vitality by analogy in the chapter 11 context." (footnote omitted). *See* Paul B. Lackey, *An Empirical Survey and Proposed Bankruptcy Code Section Concerning the Propriety of Bidding Incentives in a Bankruptcy Sale of Assets,* 93 Colum.L.Rev. 720, 730 (1993) (*"Empirical Survey"*).

Two bankruptcy courts have explicitly rejected the use of the business judgment rule for evaluating breakup fees in bankruptcy. *In re Hupp Industries, Inc.,* 140 B.R. 191 (Bankr.N.D.Ohio 1992); *In re America West Airlines, Inc.,* 166 B.R. 908, 911 (Bankr. D.Ariz.1994). In *Hupp,* the court cautioned that these fees must be "carefully scrutinized in § 363(b) asset sales to insure that the debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *Id.* at 196 (footnote omitted). The *Hupp* court listed seven factors to be considered in a determination of whether a breakup fee would be appropri-

---

**3.** Query: Can a sale of all the assets of a business corporation ever really be "ordinary course" as to the directors' business judgement? Most Business Corporation Acts would seem to require shareholder approval before disposing of all of the assets of a corporation.

**4.** "The trustee, after notice and a hearing, may use, sell, or lease, *other than in the ordinary*

ate,[5] and suggested that breakup fees should "be highly scrutinized in view of the uncertainty of dividends, if any, to be received by claimants of the debtor's estate." *Id.* at 195.[6]

The *America West* court warned that bankruptcy courts should not blindly follow non-bankruptcy courts' application of the business judgment rule to break-up fees. *America West* rejected the business judgment rule because bankruptcy courts must determine what is in the best interests of the estate, and deference to the debtor's business judgment will not always produce the result which is best for the estate.[7] In rejecting the earlier line of bankruptcy cases which followed the business judgment rule, *America West* adopted and approved of the reasoning articulated by Markell in *The Case Against Breakup Fees* (supra). *America West,* 166 B.R. at 912.

Markell refutes the argument that breakup fees are a necessary inducement to draw bidders into the asset sale process. From an economic standpoint, he suggests that the debtor can eliminate the need for a breakup fee by increasing the available information about itself and standardizing bidding procedures. By doing so, the debtor would eliminate much of the cost associated with the bidding process and increase the marginal gain available to bidders. Further, providing more information to bidders enables them to more accurately determine the value of the debtor, so that they will be more likely to submit higher bids. Thus, the debtor can

take certain actions which reduce or eliminate the need for a breakup fee and increase its chances of maximizing revenue for the estate.

Markell distinguishes the use of breakup fees outside of bankruptcy, noting that "non-bankruptcy courts focus on procedure in their review of breakup fees, while § 363(b) instructs bankruptcy courts to look at substance.... Bankruptcy courts look at process as well, but also have the ability and the responsibility to ask if the proposed transaction makes economic sense for all concerned." *Id.* at 374. Further distinctions between non-bankruptcy corporate combinations and § 363 asset sales include the inability of the trustee or debtor-in-possession to bind the estate without court approval, the obligation of debtor's management to sell the assets or reorganize, and the rights of the ultimate beneficiaries—not shareholders, but creditors.[8]

Finally, Markell argues that breakup fees are unnecessary to ensure that bidders get fair treatment in a bankruptcy asset sale. He refutes the theory that a breakup fee is liquidated damages for breach of an acquisition agreement. Liquidated damages are inappropriate because an enforceable contract for a sale of assets does not exist until court approval has been obtained. It is not a reverse option price since similar treatment is not given to the other bidders. Breakup fees should not be paid as compensation for

---

*course of business,* property of the estate." 11 U.S.C. § 363(b)(1) (emphasis added).

**5.** 1) Whether the fee requested correlates with a maximization of value to the debtor's estate;
2) Whether the underlying negotiated agreement is an arms-length transaction between the debtor's estate and the negotiating acquirer;
3) Whether the principal secured creditors and the official creditors committee are supportive of the concession;
4) Whether the subject break-up fee constitutes a fair and reasonable percentage of the proposed purchase price;
5) Whether the dollar amount of the break-up fee is so substantial that it provides a "chilling effect" on other potential bidders;
6) The existence of available safeguards beneficial to the debtor's estate;
7) Whether there exists a substantial adverse impact upon unsecured creditors, where

such creditors are in opposition to the break-up fee.
*Hupp,* 140 B.R. at 194.

**6.** *Integrated Resources* suggested a "careful scrutiny" test, but failed to follow through on its own suggestion.

**7.** As one court noted, the best interests of the estate and the best interests of the debtor "do not always coincide." *In re Clark,* 1995 WL 495951, *5 (N.D.Ill.1995).

**8.** It must be noted, however, that non-bankruptcy settings may have similar restrictions. A corporate sale of substantially all the assets of the corporation requires shareholder approval. Further, it has been held that the directors owe an increased fiduciary duty to creditors as insolvency approaches.

use by other bidders of the benefit of the initial bidder's due diligence, because bidders can adjust their bids to compensate for the cost of due diligence.

The estate has a better chance to maximize revenues when a significant amount of information is available to bidders. These "[i]ncreased revenues, in turn, translate into increased creditor dividends, a specific bankruptcy goal. If bidders suffer some loss that is made up by gains to creditors, we might very well accept that result on a policy basis." *Id.* at 379. In a free market, no-one is forcing these bidders to play the game; they choose to enter the bidding arena presumably because a profit is to be made. Why should the estate, and ultimately the creditors, pay the entry fee? *Id.* at 377–380.

In fact, as a later article notes, bidders in a § 363 asset sale enjoy several benefits not available to bidders operating outside of the Code.

> An initial advantage to acquiring a bankrupt company is that the investor knows that the company is in 'play.' In other words, a bankruptcy sale is not like a hostile takeover in which a company attempts to fend off potential acquirers.
>
> . . . .
>
> Additionally, a company in bankruptcy has certain powers that make it more attractive than nonbankrupt companies. Under the Bankruptcy Code, a debtor can reject executory contracts and leases and limit the damage claims that arise from the breach caused by this rejection. . . . Buyers are thus particularly interested in purchasing companies that are in bankruptcy: there is little risk of being saddled with onerous obligations of the old company.

Lackey, *Empirical Survey*, at 736 (footnotes omitted).[9]

Additionally, as here, the bulk of the costs incident to the initial bid are incurred far in advance of the motion seeking approval of a breakup fee. Those due diligence costs are incurred for the benefit of the bidder, en-

abling that bidder to make an informed bid, irrespective and independent of the consideration of whether that bid should be an initial bid.

■ The *America West* court adopted Markell's reasoning on all these points, and proposed a new test to replace the business judgment rule in evaluating the use of bidding incentives in bankruptcy. The *America West* test "is not whether a break-up fee is within the business judgment of the debtor, but whether the transaction will 'further the diverse interests of the debtor, creditors and equity holders, alike.'" *America West*, 166 B.R. at 912 (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir.1983)). This Court agrees with *America West* that the proper standard for evaluating a breakup fee should be whether the interests of all concerned parties are best served by such a fee. The test is whether the payment of a breakup fee is in the best interests of the estate. As previously discussed, the business judgment rule is applied by courts when the decision being reviewed is within the ordinary course of the decision-maker's business. By virtue of the fact that the breakup fee comes before this Court as part of a motion to sell assets pursuant to § 363(b), it is necessarily outside the ordinary course of the debtor's (or trustee's) business.[10] When a debtor or trustee conducts a sale under § 363(b), it has an obligation to maximize revenues for the estate. *See, e.g., In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D.Ga.1988); Thomas J. Salerno, et al., *Advanced Chapter 11 Bankruptcy Practice* Vol. I at § 7.139 (April 1994). Therefore, bankruptcy courts should carefully scrutinize breakup fees to be sure that, following the underlying policy guiding § 363, revenues will be maximized. As stated by another court, in another context, defining best interests of the estate, "The prime criterion for assessing the interests of the estate is the maximization of its value . . . ," *In re Clark*, 1995 WL 495951 (N.D.Ill.1995).

**9.** It should be noted that the Seventh Circuit has held that a sale under a liquidating plan is not always free of successor liability. *Chicago Truck Drivers v. Tasemkin*, 59 F.3d 48 (7th Cir.1995).

**10.** *See* note 5, *supra.*

■ Further, this debtor is no longer being reorganized; instead, this is a liquidating Chapter 11. This is of note for two reasons. First, regardless of whether a sale of assets is usually within the ordinary course of business, in this instance the debtor is not in the business of liquidating. Therefore, no particular deference should be given to the debtor's business decision. Second, the unsecured creditors' committee opposes payment of this breakup fee. In a liquidating Chapter 11, more deference is shown to the unsecureds' viewpoint than in a reorganization case "because the principle [sic] underlying rationale for the 'business judgment rule', i.e., that a DIP is entitled to some free reign in fulfilling its perceived mission of aiding the economy ... is lacking in such circumstances." *In re After Six, Inc.*, 154 B.R. 876, 882 (Bankr.E.D.Pa.1993) (citations omitted). Therefore, absent compelling circumstances which clearly indicate that payment of the fee would be in the best interests of the estate, breakup fees should not be awarded in bankruptcy auction sales.[11]

*Administrative Expense:*

■ Alimenta requests that it be granted an administrative expense claim pursuant to 11 U.S.C. § 503(b). In order to recover costs and expenses as a § 503(b)(3)(D) administrative expense claim, Alimenta must show a substantial contribution to the estate. Administrative expenses are priority claims, and thus are subject to strict scrutiny by the court. *Matter of Jack Winter Apparel, Inc.*, 119 B.R. 629, 632 (E.D.Wis.1990). Although "substantial contribution" is not defined in the Code, case law has established that for an entity to recover under § 503(b) it must show that (1) the services were rendered to benefit all parties in the case and not just the applicant; (2) the services provided a direct, significant and demonstrable benefit to the estate and the unsecured creditors; and (3) the services were not duplicative. *In re Envirodyne Industries, Inc.*, 176 B.R. 815, 819 (Bankr. N.D.Ill.1995). *See Jack Winter*, 119 B.R. at 633. The burden is on the applicant to prove its substantial contribution. *In re Lister*, 846 F.2d 55, 57 (10th Cir.1988); *Envirodyne*, 176 B.R. at 819. "Compensation under § 503(b) must be preserved for those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate." *Envirodyne*, 176 B.R. at 819.

*Best Interests Of The Estate:*

Under either the breakup fee or administrative expense analysis, this Court must determine whether reimbursing Alimenta's costs and expenses is in the best interests of the estate. Alimenta has argued that as the initial bidder, it rendered a benefit to the estate. Although no sale was completed, it created an opportunity for bidding at higher prices, and an increased value was placed on the Debtor's assets. In addition, Alimenta notes that it would not have made the initial bid if a breakup fee were not contemplated.

The Court rejects Alimenta's statement that a benefit was rendered to the estate by its bid. Since "any money that a bidder receives through a bidding incentive comes out of the pockets of the creditors of the estate ... there should be a direct relationship between the reimbursement an unsuccessful buyer receives and the benefit to the estate from the unsuccessful buyer's bid."[12]

---

**11.** There may be a setting in which due diligence and audit type costs resulting from an auction sale of assets may be reimbursable as an administrative expenses. This opinion is not meant to anticipate all the unique settings in which such recovery might be appropriate, nor to rule in advance on proposed scenarios. A court may conclude, prior to the sale, that full disclosure by way of an audit report to be filed and made available to interested parties could constitute a meaningful incentive to the maximization of the sale process. Should a creditors committee request that such a report be prepared, that expense could conceivably be an administrative expense. So too, if there are insufficient funds for the audit an interested potential bidder may be willing to advance the cost on condition of reimbursement as an administrative expense. Such a timely disclosure may be demonstrated to benefit the estate even if the assets are not eventually sold.

**12.** The Court notes, without deciding the issue, that if an initial bidder is to be rewarded with a breakup fee, the minimum increment which the next bidder may acceptably bid over the initial bidder must be the amount of the fee, if only to equalize the benefit to the estate.

Lackey, *Empirical Survey*, at 738 (footnotes omitted). An opportunity for other bidders to bid higher than Alimenta without a subsequent sale is of no benefit to the estate.

█ The ultimate question becomes, who pays the costs of investigating the potential subject of an auction? If Debtor agrees to reimburse a bidder or to pay the opportunity cost of bidding, then the creditors are paying those costs. The goal of a bankruptcy auction, however, is to maximize the return to the estate. The costs of bidding should be borne by those who are best able to bear them—the bidders who have voluntarily entered the bidding process, and who are bidding for a company with title free and clear of liens and with all the advantages provided by the Bankruptcy Code. Markell, *Case Against Breakup Fees*, at 374 (footnote omitted); Lackey, *Empirical Survey*, at 736 (footnotes omitted). This court rejects the line of cases which hold that break-up fees and bidding incentives in general are analyzed under the business judgment rule, and finds the reasoning of *Hupp* and *America West* persuasive. When the break-up fee before this Court is carefully scrutinized to determine whether it is in the best interests of the estate, and whether such reimbursement is appropriate to reward a substantial contribution to the estate, the answer is clearly no. Alimenta's bid may have lured in other bidders, but none of the offers received were reasonable. No sale was consummated and the estate received no benefit from Alimenta's bid.

*Standing:*

█ Finally, as Debtor noted for the Court, Alimenta is not one of the entities described in 11 U.S.C. § 503(b)(3)(D) which has standing to bring an administrative expense claim incurred by making a substantial contribution to the case. (July 12, 1995 Tr. at 12).[13]

## CONCLUSION

For the reasons stated above, Alimenta's Application for Reimbursement of Costs and Expenses Incurred in Unsuccessful Bidding will be denied.

---

13. Only creditors, indenture trustees, equity security holders, and committees representing creditors or equity security holders other than as appointed under 11 U.S.C. § 1102 may proceed under § 503(b)(3)(D). 11 U.S.C. § 503(b)(3)(D).